Filed 4/30/14  P. v. Sandoval CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047431 |
| v. | (Super. Ct. No. 09CF0780) |
| JONATHAN AGUILAR SANDOVAL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed as modified, with directions.

Corona & Peabody and Jennifer L. Peabody for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Jonathan Aguilar Sandoval of street terrorism (§ 186.22, subd. (a); all further statutory references are to this code) and murder (Pen. Code, § 187, subd. (a)), with a special circumstance finding that Sandoval intentionally killed his victim, Gerardo Cisneros, for a criminal street gang purpose (§ 190.2, subd. (a)(22)). The jury also found two enhancement allegations true on the murder count: Sandoval vicariously discharged a firearm in a shooting by a gang member (§ 12022.53, subds. (d) & (e)(1)), and he committed the offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)).

On appeal, Sandoval challenges the sufficiency of the evidence to support his murder conviction, the nature of his gang's primary activities, and whether he knew of his gang's criminal conduct. He also argues that despite the multiple victims he and his cohort targeted, section 654 bars the concurrent term the trial court imposed on his street terrorism conviction. He further contends that, having committed the offense at age 17, the 50-years-to-life sentence the trial court imposed constitutes cruel and unusual punishment under the federal and state Constitutions because it affords him no meaningful opportunity for parole. Finally, the Attorney General concedes, and we agree, the judgment must be modified to strike the 10-year gang enhancement given imposition of the 25-years-to-life gang firearm enhancement. In all other respects we find no merit in Sandoval's contentions and therefore affirm the judgment as modified (§ 1260), with directions to the trial court to correct the abstract of judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

On a weekday afternoon in June 2008, Dayanira Garcia stood on the balcony of her apartment in Santa Ana towards the south end of the 1500 block of

2

Durant Street.  She noticed a two-door vehicle with faded or worn off paint driving south on Durant Street, approaching 15th Street.  Garcia heard the occupants of the vehicle exchange "rude" insults with a group of four or five males sitting outside an apartment building.

The group included the eventual victim, Cisneros, a member of the Krazy Proud Criminals (KPC) criminal street gang.  A Santa Ana Police Department detective and gang expert, Julian Rodriguez, explained at trial that Sandoval's gang, Barrio Small Town (BST), allied itself with the Logan Street criminal street gang, and BST and Logan Street were in the midst of gang warfare with KPC.  KPC claimed Durant Street as its territory, just west of territory the Logan Street gang claimed.

Meanwhile, on the day of the shooting, Maria Mendoza was working not far from Garcia's balcony, in her food truck on Durant Street, just north of 15th street.  Like Garcia, Mendoza heard some shouting by a group of young men when a vehicle passed.  Mendoza heard one or more persons shout "KPC."  From her balcony, Garcia noticed the vehicle come to a halt, and a rear passenger exited but quickly reentered when Cisneros's group gave chase on foot.  The vehicle drove away, turning onto 15th Street.  Cisneros's group dispersed, except he and a remaining companion sat down on some stairs along Durant Street.

Garcia remained on her balcony, talking on her phone, and about 10 minutes later she saw a hooded young man with a long handgun advance up Durant Street from the intersection at 15th Street, where the vehicle in the confrontation had turned and departed.  The youth was the same person who earlier had exited and reentered the vehicle.  Mendoza also noticed the hooded figure walk by the service window of her food truck, holding a gun and headed northward up Durant Street.  Garcia

3

saw the man stop where Cisneros and his friend were seated, and he fired several shots at them.  Mendoza also heard the shots, and she threw herself down inside her truck on top of her five-year-old grandson.  Garcia saw Cisneros's companion escape and Cisneros, who had been hit by the gunfire, stumbled up and across Durant Street.  The gunman followed him briefly, but then retreated, ran back down the street, and turned and fled on 15th Street.  Garcia left her balcony, entered her apartment, and called the police.

Brenda Gonzalez heard the gunshots from her position inside the grated security door at the back of a laundromat at the north end of the block, at the intersection of Durant Street and 16th Street.  Gonzalez had just returned to the laundromat from Mendoza's food truck, and on her way back she noticed a gray car with several occupants stopped on 16th Street near its intersection with Durant Street.  When she heard the gunshots and looked back out through the security door, she noticed the car had turned onto Durant Street, facing north towards 17th Street.  The car was stopped next to a blue SUV and the occupants of the two vehicles were talking.

Gonzalez noticed Sandoval, whom she knew as "Sparky," a fellow student at Santa Ana High School, exit from the back seat of the gray car, carrying a gun. Sandoval ran south toward Cisneros as Cisneros was crossing Durant Street.  Sandoval approached him, fired five shots at him, and ran back to the gray car.  Gonzalez did not see Sandoval at school in the days immediately after the shooting, but when he returned, she overheard him telling a friend, "'We killed a Chango.'"  Detective Rodriguez explained at trial that "Chango" was a disrespectful slang term in Sandoval's gang for KPC gang members.

Cisneros died at the hospital from his gunshot wounds.  A memorial erected where he had fallen on Durant Street was later defaced by Logan Street gang graffiti.

Rodriguez and another detective interviewed Sandoval about the shooting. He initially claimed he had been picked up from school on the day of the shooting and learned about it from family members. Then he conceded he had been on foot in the area, but heard no gunshots. Then he admitted he had been walking on Durant Street with two female cousins, they had passed 16th Street headed north when they heard gunshots, and he looked back and saw a crowd gathering. Sandoval's cousin, however, denied she had been with him on the day of the shooting, which she learned about from her parents after it happened.

The prosecutor charged Sandoval and Moises Arnaldo Flores, a Logan Street gang member, with Cisneros's murder. The trial court granted Sandoval's severance motion, and Flores was tried first.[1] The jury convicted Sandoval as noted at the outset, and the trial court sentenced him to 25 years to life on the murder count, plus a mandatory consecutive 25-years-to-life term for the gang firearm use enhancement. The trial court also imposed a 10-year concurrent term on the gang enhancement, and a two-year concurrent middle term on the active gang participation conviction. Sandoval now appeals.

II

DISCUSSION

A.    *Evidentiary Contentions*

Sandoval challenges the sufficiency of the evidence to support his murder conviction, the nature of his gang's primary activities, and whether he knew of his gang's criminal conduct. On appeal, we must view the evidence in the light most favorable to the judgment. (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) It is the trier of fact's

---

[1]    We upheld Flores's murder conviction and gang enhancement allegations in a separate opinion. (*People v. Flores* (April 11, 2012, G044546) [nonpub. opn.].)

exclusive province to assess witness credibility and to weigh and resolve conflicts in the evidence. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) We therefore presume the existence of every fact reasonably inferred from the evidence in support of the judgment. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.) The test is whether substantial evidence supports the conclusion of the trier of fact, not whether the appellate panel is persuaded the defendant is guilty beyond a reasonable doubt. (*Ibid.*; *People v. Johnson* (1980) 26 Cal.3d 557, 576.) In other words, reversal is not warranted even though the circumstances could be reconciled with a contrary finding. (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.) Thus, a defendant attacking the sufficiency of the evidence "bears an enormous burden." (*People v. Sanchez*, supra, 113 Cal.App.4th at p. 330.)

1.       *Substantial Evidence Supports the Murder Conviction*

Sandoval attacks Gonzalez's eyewitness account in her police statement as clearly false and inherently improbable.[2] Gonzalez was the only witness who: (1) saw Sandoval at the murder scene, (2) claimed to hear two separate bursts of gunfire, and (3) claimed she saw Sandoval fire the second burst of shots at Cisneros. "Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Elliot* (2012) 53 Cal.4th 535, 585.) An appellate court may not reject evidence as inherently improbable unless it is shown to be "'physically impossible or so clearly false and unbelievable that reasonable minds may not differ with respect thereto.'" (*People v. Jenkins* (1965) 231 Cal.App.2d 928, 931.)

_____

[2]       The prosecutor introduced Gonzalez's police interviews as a prior inconsistent statement when she claimed at trial she could not remember the shooting.

6

"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) As sole judges of credibility, jurors "'may believe all, part, or none of a witness'[s] testimony.'" (*People v. Lawrence* (2009) 177 Cal.App.4th 547, 553; CALCRIM Nos. 105, 226.)

Sandoval relies on the fact that investigators could not replicate one aspect of Gonzalez's statement. She told detectives in her interview that she spotted from inside the back security door of the laundromat a gray car stopped on 16th Street, and she identified Martin Robles as one of the occupants sitting inside the vehicle. But a detective who peered through the laundromat's back door could not see into a police vehicle parked where Gonzalez said the gray car had stopped. Based on this discrepancy, Sandoval asserts Gonzalez "could not possibly have seen the occupants of the gray car *or the location of the shooting*." (Italics added.)

The discrepancy, however, does not establish it was physically impossible to see into the gray vehicle as Gonzalez claimed. The weather, time of day, angle of view, window reflections, differences between the police vehicle and the gray car, or other factors may have accounted for the discrepancy between what Gonzalez and the detective could see. In any event, the discrepancy does not establish Gonzalez could not see the shooting location. Sandoval makes that inference on appeal, but a statement's falsity "'"must be apparent without resorting to inferences or deductions."'" (*People v. Barnes* (1986) 42 Cal.3d 284, 306.)

Moreover, Gonzalez identified Sandoval when he exited the parked vehicle, not while he was inside of it. He turned and looked back in her direction, and she

7

recognized him as "Sparky," a fellow student she saw regularly at Santa Ana High School. She did not see him at school in the days immediately after the shooting, but when he returned, she overheard him telling a friend, "'We killed a Chango.'" Additionally, while Sandoval initially offered an alibi that the jury reasonably could infer reflected a consciousness of guilt, he later admitted he walked through the intersection where Gonzalez saw him. Although Sandoval claimed he had arrived there on foot with his cousins and not in a vehicle, and that he only heard the gun shots and did not fire them, the jury reasonably could credit Gonzalez's statement instead.

Sandoval protests that Gonzalez was the only witness among several who heard the second burst of gunfire that she claimed Sandoval fired, felling Cisneros. But this discrepancy does not render her account physically impossible or inherently improbable. The other witnesses were located towards the south end of Durant Street where they saw a man shoot Cisneros, but Cisneros then stumbled northward closer to where Gonzalez claimed she saw Sandoval shoot him. The jury reasonably could infer the other witnesses had moved out of earshot or were distracted in the chaos after the first shots. Mendoza, for example, threw herself to the floor inside her food truck to cover her grandchild, and Garcia stepped back from her balcony into her apartment to protect her children and call the police.

In any event, it was the jury's prerogative to credit portions of Gonzalez's statement only in part if it so chose. The fact that the jury convicted Sandoval of murder does not mean the jury credited everything Gonzalez said. Notably, the jury found true the penalty enhancement allegation that Sandoval "*vicariously* discharged a firearm causing death to the victim . . . ." (Italics added.) Thus, in convicting Sandoval of murder, the jury may have concluded Gonzalez's testimony did not establish Sandoval

8

personally fired any shots at Cisneros, but that he nevertheless aided and abetted his cohort in the slaying.

As Detective Rodriguez explained, gang members typically provide mutual "backup" and "strength in numbers" in committing crimes, especially in a rival gang's territory. Thus, by their presence they aid in an assault either indirectly as lookouts or a threat of reserve force, or directly to complete the offense if a compatriot is ineffectual, disarmed, or disabled. The jury reasonably could conclude Sandoval served his gang in this capacity as a foot soldier at the murder scene, and his presence was no mere coincidence as he claimed. To the contrary, highlighted in his decision to exit his vehicle at a critical moment, as Gonzalez described, he provided material support in ensuring Cisnero's death, and therefore was guilty of murder. Substantial evidence supports the jury's verdict.

2.   *Substantial Evidence Supports the Gang Conviction and Findings*

Sandoval challenges the sufficiency of the evidence to support his street terrorism conviction, the gang special circumstance allegation, the gang enhancement, and the gang member vicarious firearm allegation. The conviction and each allegation were predicated on the jury finding Sandoval's gang qualified as a criminal street gang (see *People v. Vy* (2004) 122 Cal.App.4th 1209, 1224), which Sandoval disputes. The conviction and the special circumstance allegation also require that the defendant knew the gang's members engage in or have engaged in a pattern of criminal gang activity (*People v. Carr* (2010) 190 Cal.App.4th 475, 486-488 (*Carr*)), which Sandoval also disputes. Neither challenge has merit.

9

(a)  *The Expert's Testimony Sufficed to Establish BST's Primary Activities*

"To establish that a group is a criminal street gang within the meaning of the [gang] statute, the People must prove:  (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) *one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses*; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity."  (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457, italics added.)

As our Supreme Court has explained, a gang's primary activities may be established in two ways.  First, "proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324, original italics (*Sengpadychith*).)  Thus, the prosecution may rely on evidence of particular "past or present criminal acts" committed by a group's members, provided the offenses are enumerated in section 186.22, subdivision (e), and they aggregate to form a "chief" or "principal" gang endeavor, rather than "the occasional commission of those crimes by the group's members."  (*Sengpadychith*, at p. 323.)

Alternatively, as here, expert testimony may "[a]lso" suffice to detail a gang's primary activities.  (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324, citing *People v. Gardeley* (1996) 14 Cal.4th 605 as an example.)  In *Gardeley*, the Supreme Court found the gang expert's testimony sufficient to establish a gang's primary activities included the sale of narcotics and witness intimidation, where the expert based his opinion "on conversations with the defendants and with other Family Crip members, his personal

10

investigations of hundreds of crimes committed by gang members, as well as information from his colleagues and various law enforcement agencies." (*Id*. at p. 620.)

Here, Detective Rodriguez opined that BST's primary activities included firearm possession and assaults with those firearms. Sandoval analogizes Rodriguez's testimony to the inadequate expert testimony offered in *In re Alexander L.* (2007) 149 Cal.App.4th 605. But in *Alexander L.*, the gang expert simply stated in a conclusory fashion that he "'kn[e]w'" the defendant's gang had been involved in certain criminal activities. (*Id*. at p. 611.) The expert did not describe his background, training, experience, or contacts with gang members or the defendant's gang. (*Ibid*.)

In contrast, here as in *Gardeley*, the expert detailed the basis for his opinion. Rodriguez described his experience beginning in 2002 as a patrol officer with regular contact with gang members and gang offenses, his later assignment as a detective in the gang unit, and his current position as a supervisor in the gang unit, where his role included disseminating police intelligence about various gangs throughout the department. He participated in more than 50 gang-related murder investigations, serving as the lead agent in many of those cases, and his experience with BST in particular was extensive. He investigated three homicides involving the gang, interviewed BST gang members, their allies, rivals, and residents living in territory claimed by BST. He was familiar with the gang's origins in Long Beach, its move to Anaheim and Santa Ana, and its turf claims and activities in each city. He consulted with other gang detectives in the Santa Ana and Anaheim police departments and reviewed "police documentation for assaults that occurred with firearms relating to Barrio Small Town gang members."

Rodriguez summarized the basis for his opinion as follows: "conferring with my colleagues from my organization, the Anaheim Police department, gang unit

11

personnel, talking to gang members that are aware that their fellow gang members have been arrested for gun violations, and again reading police reports and things of that nature." Sandoval complains that Rodriguez's testimony did not include "magic words" from *Sengpadychith* that BST members "consistently" and "repeatedly" engaged in firearm possession and assault offenses. But Sandoval's criticism misses the mark because as *Sengpadychith* explained, expert opinion testimony concerning a gang's primary activities satisfies the burden of proof because the detailed opinion of an expert "implies that the commission of [those crimes] is one of the group's 'chief' or 'principal' occupations." (*Sengpadychith*, *supra*, 26 Cal.4th at pp. 323-324.) Sandoval's challenge therefore fails.

(b) *Substantial Evidence Showed Sandoval's Knowledge of Gang Activity*

Sandoval challenges the sufficiency of the evidence to support the conclusion he knew his gang engaged in a pattern of criminal conduct. (See § 186.22, subd. (a) [criminalizing active participation "in any criminal street gang *with knowledge that its members engage in or have engaged in a pattern of criminal gang activity*," italics added].) But "just as a jury may rely on evidence about a defendant's personal conduct, as well as expert testimony about gang culture and habits, to make findings concerning a defendant's active participation in a gang or a pattern of gang activity, it may also rely on the same evidence to infer a defendant's knowledge of those activities." (*Carr*, *supra*, 190 Cal.App.4th at pp. 488-489, fn. omitted.)

Here, substantial evidence supported the conclusion Sandoval was an active member of the BST gang, and that as an active member he knew of his gang's criminal conduct. The evidence of Sandoval's active gang participation included almost a dozen police contacts, commonly known as STEP (Street Terrorism Enforcement and

12

Prevention) notices, issued by law enforcement documenting Sandoval's association with BST and its affiliate, the Logan Street gang. Sandoval acknowledged in recent STEP notices that he knew of the rivalry between Logan Street and KPC and that he had associated with the Logan Street gang for the last five years. Other evidence included his recent arrest for inscribing BST graffiti with a fellow BST gang member and, on another occasion, his arrest on unspecified charges when an associate was arrested for weapon possession; his reputation as a BST gang member even among schoolmates like Gonzalez who did not know him well; BST gang markings on his notebook at home; BST graffiti in his jail cell; his frequent association with BST gang members; a "kite" or secret note passed among jail inmates identifying Gonzalez as a BST member; and a letter in jail from a BST gang member to Sandoval containing gang greetings and discussion of other BST members. Rodriguez explained that in the gang subculture gang members boast of their offenses to garner, in a perverse fashion, "respect" for themselves and their gang.

Given this mass of evidence, we cannot say under the standard of review that the jury was required to conclude defendant was ignorant of his gang's pattern of criminal conduct. "Knowledge, like intent, is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise." (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494-495.) Sandoval's appellate challenge therefore fails.

B.    *Sentencing Issues*

1.    *New Legislation Resolves Sandoval's Constitutional Claim*

Sandoval contends his sentence of 50-years-to-life violates the prohibition on cruel and unusual punishment in the federal and state Constitutions (U.S. Const., 8th Amend.; Cal. Const., art. 1, § 17) because it is tantamount to a mandatory sentence of life

13

in prison without the possibility of parole (LWOP). (See *Miller v. Alabama* (2012) __ U.S. __, 132 S.Ct. 2455, 2469 (*Miller*) [8th Amendment bars mandatory LWOP sentences for juvenile offenders because the diminished culpability of youth and increased prospects of youthful reform generally "counsel against *irrevocably* sentencing them to a lifetime in prison," italics added].) Sandoval's 50-years-to-life sentence was the statutory minimum the trial court could impose, consisting of 25-years-to-life for first degree murder (§§ 190, 190.2. subd. (a)(22), 190.5, subd. (b)) and a mandatory consecutive term of 25 years to life for the gang firearm use enhancement (§ 12022.53, subds. (d), (e)(1)). As a panel of this court recently explained in *People v. Gonzalez* (2014) __ Cal.App.4th __ (G047199, April 30, 2014), "The reasoning in *Miller* extends not just to mandatory sentences that impose an actual LWOP term on a juvenile, but also to mandatory sentences tantamount to an LWOP term."

Sandoval's sentencing hearing in September 2012 postdated the Supreme Court's opinion in *Miller* by almost three months. Sandoval argued to no avail at the hearing that the mandatory minimum sentence of 50 years to life violated constitutional norms because it affords him no opportunity for a meaningful period of life outside prison, even if he demonstrates the reform necessary for parole. (See *People v. Perez* (2013) 214 Cal.App.4th 49, 57 ["There is a bright line between LWOP's and long sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole," original italics].)

Sandoval emphasizes that while actuarial projections suggest a child born today may live nearly 78 years, "it is generally accepted that life in prison significantly shortens one's life expectancy." (See *United States v. Taveras* (E.D.N.Y. 2006) 436 F.Supp.2d 493, 500 ["Life expectancy within federal prison is considerably

14

shortened"], vacated in part on other grounds in *United States v. Pepin* (9th Cir. 2008) 514 F.3d 193, 209; Feld, *A Slower Form of Death: Implications of Roper v. Simmons for Juveniles Sentenced to Life Without Parole* (2008) 22 Notre Dame J. of Law, Ethics & Pub. Policy 9, 63, fn. 231 ["Although the average life expectancy for children born today is 77.8 years, it is lower for men, for minorities, and significantly reduced for prison inmates who are exposed to a variety of diseases"].) Consequently, Sandoval argues his mandatory sentence of 50 years to life amounts to a de facto LWOP sentence that under *Miller* constitutes cruel and unusual punishment. Sandoval does not specify any particular request for relief, but in invoking *Miller* suggests he must be resentenced with the trial court free to depart from the mandatory minimum term it imposed, and the trial court instead may impose a sentence under which he will have a meaningful opportunity for parole and life outside prison if he demonstrates reform.

Even assuming, however, that Sandoval's sentence amounts to a mandatory de facto LWOP term without due consideration of his youth and prospects for reform, new legislation provides the very relief he seeks under *Miller*. Newly enacted Senate Bill No. 260 (2013-2014 Reg. Sess.) September 16, 2013 (SB 260), effective January 1, 2014, provides for a parole hearing for juvenile offenders like Sandoval in the 25th year of their incarceration, usually well within their life expectancy by a matter of decades, and therefore well within constitutional norms. Specifically, SB 260 provides in newly codified section 3051, subdivision (b)(3) for a parole hearing in the 25th year of incarceration for juvenile offenders sentenced to prison for a term of 25 years to life or longer. (See also § 3046, subds. (a), (c) [notwithstanding the facial minimum term of a juvenile offender's life sentence, "a prisoner found suitable for parole pursuant to a youth offender parole hearing as described in Section 3051 shall be paroled"].)

SB 260 specifies in its preamble: "The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 and the decisions of the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, and *Miller v. Alabama* (2012) 183 L.Ed.2d 407." (Stats. 2013, ch. 312, § 1.)

With the enactment of SB 260, the Legislature effectively has bestowed the relief Sandoval seeks on appeal. SB 260 omits nothing in Sandoval's ambiguous request for relief, and his invocation of *Miller* entitles him to nothing greater than SB 260 provides. Indeed, while under *Miller* the sentencing court must have the opportunity to consider the defendant's youth and prospects for reform free from the constraints of statutory provisions *mandating* an LWOP term, *Miller* does not bar a trial court from reaching the conclusion a youth is irredeemably depraved and therefore properly subject to an LWOP term. (See *Miller*, *supra*, 132 S.Ct. at p. 2469 ["we do not foreclose a sentencer's ability to make that judgment in homicide cases," provided the court considers the defendant's youth].) SB 260 thus affords in cases of de facto LWOP terms much greater relief in the form of a mandatory parole hearing than is required under *Miller*. In sum, because the Legislature's response to *Miller* in SB 260 provides the relief Sandoval seeks and leaves no basis for his constitutional claim, his appellate challenge furnishes no grounds for reversal.

16

2. *No 654 Violation*

Sandoval argues the trial court erred in imposing a two-year concurrent sentence on his active gang participation conviction (§ 186.22, subd. (a)), instead of staying imposition of the sentence under section 654. Section 654 provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The policy behind section 654 is to prevent double punishment for the same criminal act or objective, despite the commission of separate crimes. (*People v. Pena* (1992) 7 Cal.App.4th 1294, 1311.) This "is to insure that the defendant's punishment will be commensurate with his criminal liability." (*Neal v. State of California* (1960) 55 Cal.2d 11, 20; see also *People v. Latimer* (1993) 5 Cal.4th 1203 (*Latimer*).) Crimes of violence against multiple victims are separately punishable, however, even if to accomplish a single criminal objective. (*Latimer*, at p. 1212.)

In *People v. Mesa* (2012) 54 Cal.4th 191, 197-198 (*Mesa*), the Supreme Court recently explained that "'section 654 precludes multiple punishment for both (1) gang participation [§ 186.22, subd. (a)], one element of which requires that the defendant have "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of that gang" [citation], and (2) the underlying felony that is used to satisfy this element of gang participation.'" In other words, "[s]ection 654 applies where the "'defendant stands convicted of both (1) a crime that requires, as one of its elements, the intentional commission of an underlying offense, and (2) the underlying offense itself.'" (*Mesa*, at p. 198.) It remains true, however, that a felony not charged in the

17

underlying case may be used to satisfy the felonious conduct element of the street terrorism offense. (*In re Jose P.* (2003) 106 Cal.App.4th 458, 470 (*Jose P.*).)

That is the case here. The trial court's instruction on the active gang participation count identified the felonious criminal conduct underpinning that count as "committing *or attempting to commit* murder." (Italics added.) The only possible attempted murder here was aimed at Cisneros's companion on the stoop, when Sandoval's coperpetrator opened fire in the initial shooting at the south end of Durant Street. Given that Sandoval then fired his weapon, and both volleys closely followed the gang confrontation between Cisneros and the men in Sandoval's vehicle, the jury reasonably could conclude the shootings were a coordinated, retaliatory gang strike. Consequently, the jury reasonably could conclude Sandoval aided and abetted his coperpetrator's attempt to murder Cisneros's companion on the stoop in the initial shooting.

Although uncharged in this proceeding, the attempted murder served as a separate basis for the active gang participation conviction here. Consequently, the trial court reasonably could impose separate punishment without violating section 654, given Cisneros and his companion were both victims. (*Jose P.*, *supra*, 106 Cal.App.4th at p. 470.) Sandoval disagrees because the prosecutor in arguing the case to the jury only relied upon Cisneros's murder as the underlying felony conduct supporting the active gang participation conviction. But the jury was entitled to draw its own conclusions from the evidence, based on the trial court's instruction. Given the substantial evidence standard of review in which we must draw all inferences in favor of the judgment (*Elliot*, *supra*, 37 Cal.4th at p. 466), the trial court did not err in concluding there were multiple victims and section 654 therefore did not apply.

18

3.    *The 10-Year Gang Enhancement Must Be Stricken*

Sandoval contends, and the Attorney General concedes, he cannot be punished under both the gang member vicarious firearm discharge penalty enhancement (§ 12022.53, subds. (d), (e)(1)) and the street gang penalty enhancement (§ 186.22, subd. (b)) because there was no finding he personally discharged a firearm.  He is correct.

"Ordinarily, section 12022.53's sentence enhancements apply only to *personal* use or discharge of a firearm in the commission of a statutorily specified offense, but when the offense is committed to benefit a criminal street gang, the statute's additional punishments apply even if, as in this case, the defendant did not personally use or discharge a firearm but another principal did.  Section 12022.53(e)(2), however, limits the effect of subdivision (e)(1).  A defendant who *personally* uses or discharges a firearm in the commission of a gang-related offense is subject to *both* the increased punishment provided for in section 186.22 *and* the increased punishment provided for in section 12022.53.  In contrast, when another principal in the offense uses or discharges a firearm but the defendant does not, there is no imposition of an 'enhancement for participation in a criminal street gang . . . in addition to an enhancement imposed pursuant to' section 12022.53."  (*People v. Brookfield* (2009) 47 Cal.4th 583, 590.)  The 10-year concurrent term under section 186.22, subdivision (b), must be stricken.

19

## III

## DISPOSITION

We modify the judgment (§ 1260) by striking the 10-year gang enhancement (§ 186.22, subd. (b)) on the murder count (count 1), and direct the trial court to amend the abstract of judgment accordingly, and to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.