Filed 7/28/15  P. v. Tamez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> RICHARD TREVINO TAMEZ, <br><br> Defendant and Appellant. | F068488 <br><br> (Super. Ct. No. VCF228485) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

A.M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In December 2009, defendant Richard Trevino Tamez was charged with committing a forcible lewd or lascivious act upon Steven,[1] a child under the age of 14 (Pen. Code,[2] § 288, subd. (b)(1) [count 1]; see fn. 4, *post*); committing lewd or lascivious acts upon Steven (§ 288, subd. (a) [counts 2 & 3]); committing a forcible lewd or lascivious act upon Devan, a child under the age of 14 (*id.*, subd. (b)(1) [count 4]); committing lewd or lascivious acts upon Devan (*id.*, subd. (a) [counts 5, 6, & 7]); sending harmful matter to a minor (former § 288.2, subd. (a)[3] [counts 8 & 9]); and committing lewd or lascivious acts upon J.R., a child under the age of 14 (§ 288, subd. (a) [counts 10 & 11]). According to the information, he perpetrated these offenses between January 1, 2000, and April 29, 2004.

With regard to counts 1 through 7, 10, and 11, the information alleged that defendant committed the charged crimes against more than one victim; had substantial sexual conduct with the victims; was previously convicted of two felony sex offenses, i.e., oral copulation and sodomy; was a habitual sexual offender; committed the charged crimes and was previously convicted of oral copulation and sodomy; was previously convicted of two serious and/or violent felonies, i.e., oral copulation and sodomy; and was previously convicted of a serious felony, i.e., sodomy.

With regard to counts 8 and 9, the information alleged that defendant was previously convicted of two felony sex offenses, i.e., oral copulation and sodomy, and was previously convicted of two serious and/or violent felonies, i.e., oral copulation and sodomy.

---

[1]    In this opinion, certain persons are identified by their first name or initials in accordance with our Supreme Court's policy regarding protective nondisclosure. No disrespect is intended.

[2]    Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[3]    Section 288.2 was amended in 2011 (Stats. 2011, ch. 15, § 317), amended again in 2012 (Stats. 2012, ch. 43, § 16), and repealed and reenacted in 2013 (Stats. 2013, ch. 777, §§ 1, 2).

On December 16, 2010, following trial, the jury acquitted defendant on counts 10 and 11, but could not reach a verdict on counts 1 through 9. The trial court declared a mistrial as to the deadlocked counts. On September 26, 2013, following retrial,[4] the jury convicted defendant on counts 1 through 9 and found true the allegations that he (1) committed lewd or lascivious acts against more than one victim; and (2) had substantial sexual conduct with the victims. In a bifurcated proceeding, the court found true "the special allegations set forth and the priors set forth in the information," inter alia.

Defendant received an aggregate sentence of 525 years to life plus a consecutive 112 years four months. On each of counts 1 through 7, the court imposed (1) 75 years to life (§ 1170.12, subd. (c)(2)(A)(i)); (2) a five-year enhancement for a prior serious felony conviction, i.e., sodomy (§ 667, subd. (a)(1)); (3) a five-year enhancement for the prior oral copulation conviction (§ 667.51); and (4) a five-year enhancement for the prior sodomy conviction (*ibid.*). It imposed six years on count 8 and 16 months on count 9.

On appeal, defendant contends: the evidence did not establish that he exhibited harmful matter to Steven and Devan; defense counsel rendered ineffective assistance by failing to object to certain evidence; instructing the jury with CALCRIM Nos. 330 (Testimony of Child 10 Years of Age or Younger) and 361 (Failure to Explain or Deny Adverse Testimony) compelled reversal; the 75-years-to-life minimum term of each indeterminate sentence was unauthorized; and the section 667.51 enhancement based on the prior sodomy conviction was unauthorized.

We conclude: substantial evidence established that defendant exhibited harmful matter to Steven and Devan; defendant's claim of ineffective assistance of counsel must

---

[4]    Prior to defense case-in-chief at retrial, the court granted defense counsel's motion for judgment of acquittal on count 1 due to insufficient evidence (§ 1118.1), but substituted the lesser included offense—i.e., committing a lewd or lascivious act upon Steven (§ 288, subd. (a))—for the jury's consideration (see *People v. Powell* (2010) 181 Cal.App.4th 304, 311).

be rejected because the appellate record does not show the reason for his attorney's failure to object; the instruction of the jury with CALCRIM Nos. 330 and 361 was not error; and the 75-years-to-life minimum term was authorized, but the section 667.51 enhancement based on the prior sodomy conviction was unauthorized. The judgment shall be modified accordingly and, as so modified, affirmed.

## STATEMENT OF FACTS

**I.      Prosecution case-in-chief.**

a.  *Steven.*[5]

At the age of five or six, Steven temporarily lived with his grandmother Denise and defendant—then Denise's boyfriend—in a trailer home in Exeter. Steven and defendant were left by themselves whenever Denise went to work. More than once, in either the living room or the bedroom, defendant showed Steven a "porno"[6] video of "[a] male putting his penis inside the vagina of [a] girl." Devan, Steven's younger brother who sometimes visited the residence, was also shown this footage. More than once, defendant groped Steven's penis. More than once, he sodomized Steven and masturbated thereafter. Steven saw defendant fondling Devan's penis "a couple times." When Steven tried to tell Denise about the molestation, she remarked that "it was never a good time for her." He did not report the incidents to anyone else.

On cross-examination, Steven admitted that he illegally purchased and viewed pornographic movies and—at age 11 or 12—molested one of his brothers. He was granted immunity in exchange for his testimony.

---

[5]      Steven was born in February 1996. At the time of retrial, he was 17 years old.

[6]      At retrial, Steven was asked to define "porno." He responded, "Pornography, man and woman having sex."

b. *Devan.*[7]

Devan often visited Denise and defendant's trailer home when he was approximately five years old. On one occasion, in the living room, defendant put "pornography on the television" showing "a guy and a girl" "in a hospital in a hospital bed" "having sex." Defendant sodomized Devan at least twice, touched Devan's penis at least twice, and lubricated Devan's penis at least once. Devan told Denise about the molestation, but "[s]he didn't believe [him]." He did not report the incidents to anyone else.

In a December 11, 2008, interview at the Child Abuse Response Team (CART) office, Devan—then 10 years old—described numerous incidents that occurred at the trailer home in Denise's absence.[8] Defendant groped Devan's penis over 10 times. He copulated his mouth with Devan's penis at least five times. Devan was forced to lubricate his own penis with a "liquid gel" from a "pack about the size of [a] ketchup packet" "[a]bout every single time." Defendant lubricated his own penis and forcibly sodomized Devan "about every single time."[9] In one instance, he "change[d] the t.v." while Devan and Steven were watching cartoons and "put bad stuff" of "pregnant girls in the hospital and a guy coming in and … having [sex][10] with them." Steven witnessed defendant molesting Devan, but Devan did not see defendant molesting Steven. Devan and Steven "tried to tell [Denise] twice" about the abuse, but she "didn't listen" and "said … [defendant] would never do a thing like that." The boys did not report the incidents to

---

**7** Devan was born in December 30 1997. At the time of retrial, he was 15 years old.

**8** The jury watched a video recording of this interview, which was admitted pursuant to Evidence Code section 1360.

**9** During the interview, Devan related that he resisted and screamed, but was pinned to the couch and told to "shut up and be quiet."

**10** During the interview, Devan was asked to define "sex." He replied that he "d[id]n't know" and heard the word "on t.v."

5.

anyone else "[b]ecause [they] were afraid they wouldn't [be] believe[d.]"  Moreover, defendant threatened to "hunt [them] down and … hurt [them]."

c.  *Denise.*

At the time of the incidents, Denise and defendant were in a relationship and lived together in her trailer home.  Steven and Devan visited them and Steven even lived with them "for a while."  Denise worked at a truck scale and would, now and then, bring Steven and Devan to the "scale house" with her.  On these occasions, defendant picked up the boys and drove them to their home in Porterville.  Denise acknowledged there were "probably" pornographic movies in the trailer home.

On cross-examination, Denise denied that Steven and Devan told her about the molestation.

d.  *Detective Rodney Klassen.*

Klassen was assigned to the investigation in 2008.  He arranged for CART to interview Steven and Devan, but declined to have the boys undergo forensic evaluations for sexual abuse.  Klassen reasoned:

> "That decision was based on the nature of the allegations, the time frame or the delay in the report, which in this case was approximately five years from the time of occurrence to the time of disclosure, and based on that and the nature of the allegations, I determined that a [sexual abuse] exam would not be necessary or would be of any use and would actually do more mental, emotional harm to the child than to produce any value to the case. [¶] … [¶]
>
> "… [I]f I have a child who is describing an incident that just occurred, … let's say within 24 hours, 48 hours, and they're describing that either their vagina or anus was penetrated and they describe a lot of pain, … blood, … fluid coming out of the perpetrator, … there's gonna be an examination done because there's gonna be immediate and collectible physical evidence, whether that evidence is gonna be signs of an injury, such as tissue tearing, or DNA evidence such as the semen that was left there by the perpetrator.

6.

"If I have a child who is a delayed disclosure, and in this case five years, who is saying that they were anally penetrated, you have a five-year span … for … healing …, and in my training and experience and my consultations with the medical professionals that do the exams, that part of the body heals … and … also has large objects that pass through it on a daily basis so the chances of finding … DNA evidence is not gonna be there.  The chances of finding scarring are less likely, and when the scarring is found, it doesn't necessarily mean that … this … occurred because of sexual abuse because it could have occurred from a large bowel movement.

"So taking a child who's been through … the traumatic experience of having to explain being the victim of sexual abuse and then taking them to a [sexual abuse] examination where they have to disrobe for a nurse who is a stranger to them and then have that nurse spread apart their [buttocks] and start probing them with a camera to exam[ine] them and … look for scarring and take photographs of their naked body is just a very traumatic experience to a child that I don't want to put them through … unless I have to, and that was why I did not have that done with these children."[11]

At some point, Klassen interviewed defendant.  During this exchange, he handed defendant a piece of paper with the following prompt:

"We are investigating unlawful touching involving Steven [and] Dev[a]n. Please write, in detail, everything you know about that."

In response, defendant wrote:

"I do not remember much prior to Aug[ust] 23, [20]08 due to an accident on my dirt bike where I lost my memory.  But I do remember never ever touching those boys in any way that was [i]nappropriate.  They were grandsons of a girlfriend I had for three years and was around them from time to time when they stayed with us.  I have children of my own and would not act in this type of behavior."

Defendant told Klassen that he occasionally looked after Steven and Devan by himself whenever they visited on the weekends.  Defendant later added that the boys "were in his life" "an awful lot."  Defendant admitted that he possessed and watched "pornographic videos back during that time."  When Klassen inquired as to why Steven and Devan

---

[11]     The court instructed the jury that Klassen was not a physician and the portion of his testimony regarding his decision to forego the sexual abuse examinations was allowed for the limited purpose of clarifying his rationale.

would accuse him of molestation, defendant answered that "they were angry with him for no longer being in a relationship with their grandmother."

In December 2008, Klassen searched defendant's residence and found a packet of "Enzyte Topical Rush," a sexual lubricant.

e. *Michael.*[12]

Michael was four or five years old when he was molested by defendant at his aunt's house. Defendant—then married to Michael's aunt—showed Michael an "Arabic[-]theme[d]" pornographic video of "a female performing oral sex on a guy." He fondled Michael's penis and buttocks and "put … some lube on" during an attempted sodomy.

f. *Dr. Anthony Urquiza.*[13]

At retrial, Urquiza—a licensed child psychologist, professor, and director of the child abuse treatment program within the Department of Pediatrics at the University of California, Davis Medical Center—presented an overview of Child Sexual Abuse Accommodation Syndrome (CSAAS), "an educational tool [used] to train therapists about child sexual abuse." He identified five characteristics of CSAAS: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed disclosure; and (5) retraction.

First, Urquiza commented on "secrecy":

> "[A]lmost all of the time children are sexually abused by somebody with whom they have some type of ongoing relationship…. [¶] Also, they're sexually abused by somebody who's bigger or stronger. They may be in a position of authority or have some control over them. Those things, that acquaintance and that sort of imbalance of power control, are really

---

[12] Michael was born in September 1989. At the time of retrial, he was 23 years old.

[13] The prosecutor filed a motion in limine to admit Urquiza's testimony "to assist the jury in understanding victim conduct during and after a molesting relationship." The court granted the motion on the condition that the testimony "not [be] fact specific to this case …." Defense counsel did not object.

important in trying to understand this notion of secrecy. [¶] … [W]hy do kids keep quiet about being sexually abused?... [¶] … [S]ometimes they're … outright threatened. They're told if you tell, then something bad will happen to you. If you tell, I'll hurt you, I'll beat you up, I'll kill you. [¶] … [¶] … Sometimes kids are just intimidated by a bigger, stronger person in their control, especially if there might be some potential force involved."

Second, he described "helplessness":

"[S]ometimes people think if you're a child and somebody approaches you … with sexual intent and in a sexually inappropriate way, that you should be able to do something to keep yourself safe…. You maybe run away, you can yell, you can scream, you can holler, you can do something to keep yourself safe, and what we know from literally decades of research is that just doesn't happen. [¶] When in a relationship with somebody who has access to you, who has control and power, bigger and stronger than you and has ability to follow through on a threat, kids don't have any re[c]our[s]e, they're helpless, they're vulnerable, and they usually don't say anything, and there's nothing they can do in that situation. [¶] … [¶] … [I]t may also be that there might be some impairment on the people who are responsible for keeping kids safe. So you may have a mom or a dad who are at work or … letting inappropriate people into the house and so that increases their vulnerability or helplessness, or the person who's supposed to keep you safe is also the person who's abusing you, and in that situation, there's really nothing you can do."

Third, Urquiza discussed "entrapment and accommodation":

"[I]f somebody is sexually abusing you and you can't tell anybody about it and you can't do anything about stopping it from happening next time, then you're stuck…. [¶] … [H]ow do kids accommodate, … how do kids cope with the experience of being sexually abused? [¶] … [B]eing sexually abused comes with being ashamed, being humiliated, being embarrassed, being disgusted, sometimes being traumatized. All of those are really, really difficult feelings to tolerate…. [¶] … [¶] What works really, really well, and it's a common thing that we see in therapy with kids who are abused is what we call disassociation…. [D]isassociation means to disengage a part of your current reality. [¶] … [¶] What we know from kids who have been sexually abused, they can disengage from those feelings of being ashamed or disgusted, humiliated during the experience of abuse, and it helps them manage their feelings about being abused. [¶] … [¶] … [J]ust because a child doesn't break down and cry doesn't mean that they weren't sexually abused. It may well be that that's how they're managing the feelings that they have about being abused."

Next, he explained both "delayed disclosure" and a related characteristic called "unconvincing disclosure":

"A lot of people think if you're sexually abused, you're gonna tell somebody right away…. [W]e know that kids … take[] … a long time to … tell somebody for the very first time that they were sexually abused. [¶] … [¶] We also know that roughly a third of kids fail to disclose prior to the age of 18. So this notion of telling right away sometimes happened but not often. Most of the time, it is months or years, sometimes even decades before a victim is able to tell somebody for the very first time that they were abused. That's a delayed disclosure. [¶] … [¶] … I think it comes down to being afraid…. because there's some threat, there's some level of coercion imposed on them …. Then after a while, it's okay, I didn't tell today, I didn't tell the second time it happened, I didn't tell the 15th time it happened, so now I'm still afraid of telling but it's also am I responsible? Is there something that I did bad? Am I gonna get blamed? Am I gonna have to explain why it's been happening for the last six months and I didn't tell when I could have told before? [¶] All those things wrapped up together in kids—and you can understand it because people generally don't like talking about sexual things…. It's a hard thing to do, and then to talk about being victimized on top of all that, it's just an incredibly difficult thing to do. [¶] … [¶]

"… [Occasionally,] kids will make some type of overture. They'll say he touched me in a weird way or touched me in a bad way to someone, and if the response is supportive, then they may tell more. [¶] And a supportive statement would be a mom who would say it's okay, I'll make sure you're safe; it's not your fault, I'll take care of you; nothing you did was bad, those kinds of things. [¶] Then they feel it's okay to tell more, and as they continue to get support for making a disclosure, they tell more and more and more, and what we've seen … is kids make an initial disclosure and then a second disclosure which often has more information and then subsequent disclosures that include more and more and more information. [¶] … [I]t looks unconvincing [be]cause some people think kids should say everything all out at the first time and just repeat it over and over and over again. That's really not what happens. It's a hard thing to do, and kids go through this process not eager to talk about being sexually abused, not eager to get it off their chest, and when they do, it sort of comes out as a process. [¶] … [¶] … If you make an initial disclosure and there's no response, no one's gonna come to your aid, and it's a really hard thing to do that first time, then it's hard to muster up the courage. It's really what it is for kids, to be able to make another disclosure again down the road."

10.

Finally, Urquiza described "retraction":

"[S]ome kids who disclosed being sexually abused after they disclosed took back the allegations that no, I was never abused…. [T]he fear at the time was people will think they were never abused in the first place, yet we have data to support the fact that sometimes kids who were abused and disclosed took [it] back. [¶] … [M]aybe 20 percent of the kids who are able to make a disclosure will retract it, and the best predictor of a retraction is a family member pressuring the child to keep quiet."

## II. Defense case-in-chief.

Defendant testified that he did not molest Steven and Devan. He did not babysit or transport them by himself. Defendant was never left alone with the boys because their family was aware of past child molestation accusations made against him.

On cross-examination, defendant stated that he had sustained temporary short-term memory loss as a result of a motorcycle accident before he was interviewed by Klassen. He denied telling Klassen that he babysat Steven and Devan. Defendant recalled telling Klassen that he gave them rides to their house. He also recalled telling Klassen that he showered with the boys in Denise's presence. Defendant denied owning pornographic videos, but admitted to viewing pornography on television.

## DISCUSSION

### I. Substantial evidence established that defendant exhibited harmful matter to Steven and Devan.

a. *Standard of review.*

"When an appellant challenges the sufficiency of the evidence, the reviewing court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1511 (*Aispuro*); see *People v. Tripp* (2007) 151 Cal.App.4th 951, 955 ["We must draw all reasonable inferences in support of the judgment."].) "For evidence

11.

to be 'substantial' it must be of ponderable legal significance, reasonable in nature, credible and of solid value." (*Aispuro*, *supra*, at p. 1511.)

"Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.) "If the circumstances reasonably justify the jury's finding, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*Aispuro*, *supra*, 157 Cal.App.4th at p. 1511.)

b. *Analysis.*

"Every person who, with knowledge that a person is a minor, … knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means … any harmful matter … to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor, is guilty of a public offense …." (Former § 288.2, subd. (a); accord, *People v. Powell* (2011) 194 Cal.App.4th 1268, 1287 (*Powell*); *People v. Dyke* (2009) 172 Cal.App.4th 1377, 1382 (*Dyke*).) "'Harmful matter' means matter,[14] taken as a whole, which to the average person, applying contemporary

---

**14**     "'Matter' means any book, magazine, newspaper, video recording, or other printed or written material or any picture, drawing, photograph, motion picture, or other pictorial representation or any statue or other figure, or any recording, transcription, or mechanical, chemical, or electrical reproduction or any other articles, equipment, machines, or materials." (§ 313, subd. (b).)

statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." (§ 313, subd. (a); accord, *Powell*, *supra*, at p. 1288; *Dyke*, *supra*, at p. 1382.)[15]

Defendant does not appear to dispute that Steven and Devan viewed *something* at the trailer home. Instead, he contends the evidence did not establish that (1) the boys observed patently offensive material; and (2) the material lacked serious literary, artistic, political, or scientific value for minors. Defendant cites *Dyke* as supporting authority. In that case, A.S.—a 16-year-old female—testified that she and Dyke—her friend's father— were watching television when he switched the channel to "pornographic" programming. (*Dyke*, *supra*, 172 Cal.App.4th at p. 1380.) In particular, she recalled two scenes: (1) "a naked woman dancing"; and (2) "a naked woman and a naked man 'having sex.'" (*Ibid.*) The latter scene "showed only their upper bodies, from a side angle, and the woman was on top." (*Id.* at pp. 1380-1381.) Based solely on A.S.'s testimony, Dyke was convicted of sending harmful matter to a minor. (*Id.* at pp. 1380, 1384.) On appeal, Division Four of the First Appellate District reversed the conviction on the basis of insufficient evidence. (*Ibid.*) It explained:

> "[T]he question of what is '"patently offensive"' under the community
> standard obscenity test is essentially a question of fact. [Citation.] Thus,
> we consider whether a rational trier of fact could have found the television
> clips viewed by A.S. to be patently offensive under contemporary statewide

---

[15] Section 313, subdivision (a), "essentially 'tracks' the three-prong test for obscenity articulated by the United States Supreme Court in *Miller v. California* (1973) 413 U.S. 15, 24" (*Dyke*, *supra*, 172 Cal.App.4th at pp. 1382-1383) with some exceptions. First, "the relevant community standard by which the material is evaluated is 'statewide'" under the state statute. (*Id.* at p. 1383.) Second, the statute provides that "the work must lack serious literary, artistic, political, or scientific value *for minors*." (*Ibid.*) Third, ""'"the *Miller* obscenity test does not incorporate the 'taken as a whole' standard into the second part of the test"'" (*Powell*, *supra*, 194 Cal.App.4th at p. 1289), "i.e., the 'patently offensive' specification" (*ibid.*).

13.

standards.  Under this test, 'the primary concern' is that the communication be 'judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one.' [Citations.]  [¶] … [¶]

"We conclude there is insufficient evidence in the record to hold that the television images, as described by A.S., met the test for harmful matter. First, applying a contemporary adult standard, nudity alone is not per se obscene [citation], and the [United States Supreme C]ourt has stated that 'all nudity cannot be deemed obscene even as to minors [citation].  Indeed, the definition of sexual conduct in a statute found in a companion chapter of the Penal Code includes a variety of sexual acts, but not simple nudity or nude dancing.  [Citations.]  Likewise, portrayals of sexual activity are not ipso facto obscene [citation], even if they may be characterized as 'dismally unpleasant, uncouth, and tawdry' [citation].  As the [United States Supreme C]ourt stated …, 'sex and obscenity are not synonymous.'  Accordingly, in order to determine whether a portrayal of sex is patently offensive to the average adult, '[a] reviewing court must, of necessity, look at the context of the material, as well as its content.'  [Citation.]

"What is missing from this record is any context by which the reasonable trier of fact can make this determination.  There is only a bare-bones recital by A.S. of what she saw:  a nude woman dancing and a naked couple having sex, shown from the waist up, and her own characterization of it as 'pornography.'  Without more, neither we nor the jury are permitted to presume that such content is patently offensive to the average adult, applying statewide community standards.

"Even if a reasonable jury could conclude that the television clips observed by A.S. 'depict[] or describe[], in a patently offensive way, sexual conduct' [citation], not all depictions of such conduct constitute harmful matter.  Section 313, subdivision (a) also requires that the matter, 'taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.'….  [¶] … [¶]

"It is impossible on this record to conclude that the television segments A.S. observed did not contain 'serious literary, artistic, political, or scientific value for minors.'  [Citation.]  Was the dance by the unclothed female lurid, artistic, or even a cultural or tribal dance?  There is no way to know and no reasonable basis for inferring that it lacked such value.  As to the … glimpse of the couple presumably having sexual intercourse, was the clip part of a tawdry adult film, a former Academy Award winner being shown on television that night, or even a brief scene from Shakespeare's Romeo and Juliet?  Once again the record provides no basis for drawing a

14.

reasonable inference that either clip lacked 'serious literary, artistic, political, or scientific value for minors.' Without that evidence, a reasonable jury would not be able to judge the clips viewed by A.S. to be 'harmful matter,' as defined in section 313." (*Dyke*, *supra*, 172 Cal.App.4th. at pp. 1384-1387, fns. omitted.)

We disagree with defendant's contentions. The record—viewed in the light most favorable to the judgment—indicates that Steven and Devan were shown the same footage. In contrast to A.S.'s "bare-bones recital" in *Dyke*, *supra*, 172 Cal.App.4th at page 1385, Steven's testimony did not solely describe simple nudity or an artfully-edited sex scene. Rather, Steven unambiguously testified that he saw "[a] male putting his penis inside the vagina of [a] girl." (See *Powell*, *supra*, 194 Cal.App.4th at p. 1295 [victim's account of watching a movie in which actors displayed uncensored genitalia and participated in simulated or unsimulated sexual activity sufficiently established patently offensive sexual conduct].) In addition, Devan related that the footage luridly portrayed pregnant females engaging in sexual intercourse with a male in a hospital setting. Given these details, a reasonable trier of fact could have determined that Steven and Devan were exposed to matter that depicted patently offensive sexual conduct and lacked serious literary, artistic, political, or scientific value for minors.

II.     **Defendant's claim of ineffective assistance of counsel must be rejected because the appellate record does not show the reason for defense counsel's failure to object to certain evidence.**

On appeal, defendant questions the admissibility of (1) Klassen's statement at retrial that defendant—in response to Klassen's question regarding the veracity of Steven and Devan's molestation accusations—declared that the boys "were angry with him for no longer being in a relationship with their grandmother"; and (2) Urquiza's CSAAS testimony. However, he concedes that defense counsel did not object to either. "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless … [¶] … [t]here appears of record an objection to … the evidence that was timely made and so stated as to

make clear the specific ground of the objection …." (Evid. Code, § 353, subd. (a); accord, *People v. Partida* (2005) 37 Cal.4th 428, 433; see *id.* at p. 434 ["The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal."'"].) Here, in the absence of any timely objections, defendant forfeited these evidentiary challenges.

Defendant alleges that defense counsel rendered ineffective assistance by failing to object. (See *Harrington v. Richter* (2011) 562 U.S. 86, 105 ["An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial …."].) To establish ineffective assistance of counsel, a defendant must show (1) defense counsel did not provide reasonably effective assistance in view of prevailing professional norms; and (2) defense counsel's deficient performance prejudiced the defense. (See *People v. Oden* (1987) 193 Cal.App.3d 1675, 1681, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) "If the [appellate] record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

The record before us "'does not illuminate the basis for the attorney's challenged acts or omissions ….'" (*People v. Silvey* (1997) 58 Cal.App.4th 1320, 1329.) Defense counsel was never asked to explain why he failed to object and we cannot find "no satisfactory explanation" (*People v. Scott*, *supra*, 15 Cal.4th at p. 1212) for his refrainment as case law permits: (1) a defendant, who is "a percipient witness to the events at issue" and who has personal knowledge of the other witnesses to those events, to be asked to provide insight on whether those other witnesses are intentionally lying, have a bias, or are merely mistaken (*People v. Chatman* (2006) 38 Cal.4th 344, 382; see

16.

*id*. at p. 383); and (2) CSAAS testimony "for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse" "in a judicial proceeding presenting the question [of] whether a child has been sexually molested" (*In re S.C.* (2006) 138 Cal.App.4th 396, 418).  Moreover, "'"'[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel" [citation].'  [Citation.]"  (*People v. Gurule* (2002) 28 Cal.4th 557, 609-610; see *People v. Jones* (2003) 29 Cal.4th 1229, 1254 ["'"'[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"'"']; *People v. Riel* (2000) 22 Cal.4th 1153, 1185 ["'Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight….  A reviewing court will not second-guess trial counsel's reasonable tactical decisions.'"].)  Accordingly, we reject defendant's claim of ineffective assistance of counsel.

**III.    There was no error in the giving of CALCRIM Nos. 330 and 361.**

a.  *Background.*

During the jury instruction conference, the trial court and the attorneys discussed CALCRIM Nos. 330 and 361:

> "[THE COURT:]  So I intend to give … [CALCRIM No.] 330, although actually, no child was 10 years or younger at the time they testified.
>
> "[PROSECUTOR]:  If you read [the proposed instruction], it says the CART interview just to be on the safe side to clarify they did hear testimony from a child.
>
> "THE COURT:  … [T]hat is brilliant work.  I like that, and I think you're absolutely right.  [¶]  All right.  Any thoughts on that …?
>
> "[DEFENSE COUNSEL]:  No, your Honor.  [¶] … [¶]
>
> "THE COURT:  … [G]iven the defendant's testimony, I now intend to give [CALCRIM No.] 361.  [¶]  You may want to take a look at that ….

17.

"[DEFENSE COUNSEL]: No, that's appropriate."

The court subsequently read these instructions to the jury:

"Now, as to Devan on the CART interview, he was under the age of 10 when he gave that interview so [CALCRIM No. 330] applies.

"[CALCRIM No. 330:] You have heard … the CART interview of Devan, … a child who at that time was 10 years or younger. As with any witness, you must decide whether the child gave truthful and accurate testimony.

"In evaluating the child's testimony, you should consider all the factors surrounding the testimony, including the child's age[ and] level of cognitive development—when you evaluate the child's cognitive development, consider the child's ability to perceive, understand, remember[,] and communicate.

"While a child and an adult witness may behave differently, that difference does not mean one is any more or less believable than the other. You should not discount or distrust the testimony of a witness just because he or she is a child. [¶] … [¶]

"[CALCRIM No. 361:] If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based upon what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove each element of a crime beyond a reasonable doubt.

"If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

b. *Standard of review.*

We review a claim of instructional error de novo. (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.)

c. *Analysis.*

Defendant concedes on appeal that defense counsel did not object to either the modified CALCRIM No. 330 or CALCRIM No. 361. However, section 1259 provides that an appellate court may review "any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the

18.

defendant were affected thereby." (Accord, *People v. Brown* (2003) 31 Cal.4th 518, 539, fn. 7.) "The cases equate 'substantial rights' with reversible error, i.e., did the error result in a miscarriage of justice?" (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978; see *People v. Watson* (1956) 46 Cal.2d 818, 836 ["[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."].) "'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim ....' [Citation.]" (*People v. Lawrence* (2009) 177 Cal.App.4th 547, 554, fn. 11.)

First, we conclude the court's instruction with the modified CALCRIM No. 330 did not constitute an instructional error. "In charging the jury the court … may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case …." (§ 1127; accord, Cal. Const., art. VI, § 10.) Hence, a court may give a cautionary instruction "'relating to certain kinds of evidence and witnesses … where necessary to protect … against mistake or unwise action by the jury.' [Citation.]" (*People v. Sutton* (1964) 231 Cal.App.2d 511, 515.) In the instant case, the jury watched a video recording of Devan's December 11, 2008, interview, which was conducted when he was 10 years old. In a clear attempt to guard against any mistake or unwise action by the jurors as to the credibility of Devan's remarks, the court gave a cautionary instruction "reject[ing] traditional notions of child[ren] … as susceptible to leading questions, incapable of recalling prior events accurately, and neither reliable nor truthful." (*People v. McCoy* (2005) 133 Cal.App.4th 974, 978-979.) That this instruction turned out to be a variant of CALCRIM No. 330— which normally "assists the jury in evaluating a child witness's performance on the witness stand" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 814-815)—did not make the instruction erroneous. "Trial courts … are not bound by the suggested language of the

standard [jury] instruction and are free to adapt it to fit the circumstances of the case ….” (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12.)

Second, we conclude the court neither erred, nor was defendant prejudiced by, the giving of CALCRIM No. 361. CALCRIM No. 361 provides that adverse inferences may be drawn if a defendant fails to explain or deny evidence against him which he can reasonably be expected to explain or deny. “[B]efore a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference.” (*People v. Saddler* (1979) 24 Cal.3d 671, 681.) During examination at retrial, defendant unmistakably denied owning pornographic videos and molesting, babysitting, or otherwise being left alone with Steven and Devan. “A contradiction between the defendant’s testimony and other witnesses’ testimony does not constitute a failure to deny which justifies giving the instruction.” (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.) However, Devan testified defendant would put lubricant, that came from a packet, on his penis, and Klassen located a lubricant gel packet called “Enzyte Topical Rust” in defendant’s residence. Defendant never explained the presence of the packet, a piece of evidence that corroborated Devan’s testimony.[16] Accordingly, we find there was a fact in the People’s case which defendant failed to explain that was within his particular knowledge to explain.

That does not necessarily mean the jury found a failure to explain, nor considered it in their deliberations. In their arguments to the jury, neither counsel mentioned CALCRIM No. 361 nor argued a failure by defendant to explain a fact of evidence.

[16] Defendant was not asked about Devan’s testimony regarding the lubricant nor about the lubricant packet located in his residence. That does not, however, negate a conclusion that he failed to explain incriminating evidence. (*People v. Redmond* (1981) 29 Cal.3d 904, 911 [as for defense counsel not questioning the defendant on the subject, the scope of direct examination is a tactical trial choice; as for the People not questioning defendant on the subject, the controlling consideration is whether the issue was within the scope of the defendant’s direct examination and whether the evidence supported the instruction, not whether the prosecution asked defendant to explain the evidence].)

Additionally, the CALCRIM No. 361 instruction did not tell the jury there was a failure to explain a fact of evidence. It merely told them they *may* consider a defendant's failure to explain or deny evidence in evaluating the evidence *if* such a failure occurred. Furthermore, the court instructed the jury with CALCRIM No. 200 (Duties of Judge and Jury). They were told, in pertinent part:

> "You must decide what the facts are. It is up to you and all of you alone to decide what happened based only on the evidence that's been presented to you in this trial. [¶] … [¶] Pay careful attention to all of these instructions and consider them together.… [¶] … [¶] Some of these instructions may not apply depending on your findings of the facts. After you have decided what the facts are, follow the instructions that apply to the facts as you find them to be."[17]

"We must … assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Henley* (1969) 269 Cal.App.2d 263, 271.)

Even if we were to find the instruction should not have been given, we would conclude defendant was not prejudiced. Defendant argues the record "disclose[d] a vulnerable prosecution case" in that it was a "credibility contest between [defendant] and his accusers." He points to the lack of medical evidence and to Denise's denial that Steven and Devan told her about the molestation. The totality of the evidence, however, presented a very different picture. Defendant sexually abused two little boys in a substantially similar way. In each case, he had the child view pornographic media and then touched their penises and sodomized them. One child saw defendant touch the other child's penis. Approximately seven to eight years prior, defendant molested a third, unrelated, little boy in a similar way. The two current victims did not know, nor had ever met, the victim of the prior molestation. Defendant used liquid gel from a packet to

---

[17] If instructing a jury with CALCRIM No. 361 were improper, instructing a jury to "'disregard any instruction which applies to a state of facts which you determine does not exist,'" may be considered in assessing the prejudicial effect of doing so. (*People v. Saddler*, *supra*, 24 Cal.3d at p. 684.)

lubricate Devan, had tried to put lubrication "or something" on the first unrelated little boy years prior, and a packet of sexual lubricant was found in defendant's residence by Klassen. Defendant admitted to Klassen that Steven and Devan visited the trailer, that he may have watched them alone, and that he watched pornography and had pornographic videos. When he testified, however, defendant said he never told the detective he had babysat the boys, had never been left alone with the boys, and had not molested them. He did testify, however, that he told the detective he used to "put the kids in the shower with [him]," and Denise was present. Defendant testified that he had been accused of molestation before and had "some felony convictions." The evidence was strong and resulted in a jury that reached its verdict in less than an hour.

## IV. The 75-years-to-life minimum term of each indeterminate sentence was authorized, but the section 667.51 enhancement based on defendant's prior sodomy conviction was not authorized.

a. *Background.*

On September 26, 2013, the jury convicted defendant on counts 1 through 9 and found true the special allegations that he (1) committed lewd or lascivious acts against more than one victim; and (2) had substantial sexual conduct with Steven and Devan. In a bifurcated proceeding, the trial court ruled on the other allegations:

> "I find it to be true beyond a reasonable doubt that the special allegations set forth and the priors set forth in the information are true. The defendant has been convicted of [oral copulation] … and [sodomy] on April 2nd, 1997 …. [¶] I also find it true pursuant to … [s]ection 1170.12 beyond a reasonable doubt that he has two prior strikes pursuant to those same two convictions … and I also find it to be true the nickel prior[] pursuant to [section] 667[, subdivision ](a)(1) beyond a reasonable doubt as to the [sodomy] conviction … on April 2nd, 1997, … and … also, the special allegation I'm finding true pursuant to … [s]ection 667.51[, subdivision ](a) that he suffered the same two prior convictions, I find that beyond a reasonable doubt …, violating … [s]ection[s] 286[, subdivision ](c) and 288a[, subdivision ](c), find those true beyond a reasonable doubt."

22.

On November 19, 2013, the court pronounced an aggregate sentence of 525 years to life plus a consecutive 112 years four months. On each of counts 1 through 7, it imposed (1) 25 years to life pursuant to sections 667.61, subdivision (a), and 667.71, which tripled to 75 years to life pursuant to section 1170.12, subdivision (c)(2)(A)(i); (2) a five-year enhancement for the prior serious felony conviction, i.e., sodomy, pursuant to section 667, subdivision (a)(1); (3) a five-year enhancement for the prior oral copulation conviction pursuant to section 667.51; and (4) a five-year enhancement for the prior sodomy conviction pursuant to section 667.51. The court imposed six years on count 8 and 16 months on count 9.

b. *Standard of review.*

If a trial court imposes a sentence unauthorized by law, a reviewing court may correct that sentence whenever the error is brought to its attention. (See *People v. Serrato* (1973) 9 Cal.3d 753, 763, disapproved on other grounds in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1.) "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case. Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing." (*People v. Scott* (1994) 9 Cal.4th 331, 354.)

c. *Analysis.*

i. The 75-years-to-life minimum term.

Section 667.61, known as the "One Strike" law (*People v. Hammer* (2003) 30 Cal.4th 756, 759), prescribes a prison term of 25 years to life for a person who has been previously convicted of a qualifying felony sex offense (§ 667.61, subds. (a) & (d)(1)). Qualifying offenses include sodomy "in violation of paragraph (2) or (3) of subdivision (c) … of [s]ection 286" (*id.*, subd. (c)(6)) and oral copulation "in violation of paragraph (2) or (3) of subdivision (c) … of [s]ection 288a" (*id.*, subd. (c)(7)). Punishment under the One Strike law shall apply only if the prior conviction "is either

23.

admitted by the defendant in open court or found to be true by the trier of fact."
(§ 667.61, subd. (o).)

Section 667.71, known as the "habitual sexual offender statute" (*People v. Murphy* (2001) 25 Cal.4th 136, 139-140), prescribes a prison term of 25 years to life for a person who has been previously convicted of one or more qualifying sex offenses (§ 667.71, subds. (a)-(b)). Qualifying offenses include sodomy "in violation of subdivision (c) … of [s]ection 286" (*id.*, subd. (c)(7)) and oral copulation "in violation of subdivision (c) … of [s]ection 288a" (*id.*, subd. (c)(8)). Punishment under section 667.71 "shall apply only if the defendant's status as a habitual sexual offender is … either admitted by the defendant in open court, or found to be true by the trier of fact." (*Id.*, subd. (f).)

Under the "Three Strikes" law (*People v. Acosta* (2002) 29 Cal.4th 105, 108, fn. 1, citing §§ 667, subds. (b)-(i), 1170.12), "if a defendant has two or more prior serious and/or violent felony convictions … that have been pled and proved, the term for [the] current felony conviction shall be an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as …  [¶]  … three times the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior serious and/or violent felony convictions …."  (§ 1170.12, subd. (c)(2)(A)(i); accord, § 667, subd. (e)(2)(A)(i).)  In the event a defendant is eligible for sentencing under both the Three Strikes law and either the One Strike law or the habitual sexual offender statute, the provisions are applied "cumulatively" (*People v. Snow* (2003) 105 Cal.App.4th 271, 278, 281), i.e., the Three Strikes law mandates an indeterminate life sentence and the minimum term of that sentence is derived in part from either the One Strike law or the habitual sexual offender statute, which constitutes "the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior serious and/or violent felony convictions" (§ 1170.12, subd. (c)(2)(A)(i); see *People v. Acosta*, *supra*, 29 Cal.4th 105 [interplay of Three Strikes

law and One Strike law]; *People v. Murphy*, *supra*, 25 Cal.4th 136 [interplay of Three Strikes law and habitual sexual offender statute]).

At sentencing, on each of counts 1 through 7, the court imposed 25 years to life as "the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior serious and/or violent felony convictions" (§ 1170.12, subd. (c)(2)(A)(i)) based on both the One Strike law and the habitual sexual offender statute. Defendant argues that neither scheme was applicable. We agree only as to the One Strike law. The record shows that defendant had been previously convicted of (1) sodomizing a person under 14 years of age who was more than 10 years younger than him; and (2) orally copulating a person under 14 years of age who was more than 10 years younger than him. These crimes—violations of sections 286, subdivision (c)(1), and 288a, subdivision (c)(1), respectively—are not qualifying felony sex offenses under the One Strike law. (See § 667.61, subd. (c)(6)-(7).) However, they do fall within the ambit of the habitual sexual offender statute. (See § 667.71, subd. (c)(7)-(8).)

The outstanding issue is whether the 75-years-to-life minimum term—resulting from the cumulative application of the Three Strikes law and the habitual sexual offender statute—was authorized. Defendant maintains it was not because the court "did not state that [it] found true that the prior convictions qualified for … [the] Habitual Sexual Offender 25-years-to-life sentencing provision[]" and "[t]he Court's silence … therefore constituted [an] implied acquittal …." We disagree. At the bifurcated proceeding, the court initially pronounced that "the special allegations set forth and the priors set forth in the information" were true beyond a reasonable doubt. It then specified some of these allegations, but did not expressly mention section 667.71. Later, at sentencing, the court imposed—as "the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior serious and/or violent felony convictions" (§ 1170.12, subd. (c)(2)(A)(i))—25 years to life pursuant to section 667.71, inter alia. In doing so, "the court impliedly—but sufficiently—rendered a finding of true as to the

25.

[section 667.71] allegation ….." (*People v. Clair* (1992) 2 Cal.4th 629, 691, fn. 17; accord, *People v. Chambers* (2002) 104 Cal.App.4th 1047, 1050-1051.) Hence, under the circumstances of this case, the 75-years-to-life minimum term was lawfully imposed.

        ii.  The section 667.51 enhancement based on defendant's prior sodomy conviction.

Section 667, subdivision (a)(1), provides that "any person convicted of a serious felony who previously has been convicted of a serious felony … shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately." Section 667.51, subdivision (a), provides that "[a]ny person who is convicted of violating [s]ection 288 … shall receive a five-year enhancement for a prior conviction of an offense specified in subdivision (b)." Section 667.51, subdivision (b), lists sodomy (§ 286) and oral copulation (§ 288a), inter alia.

"[W]hen multiple statutory enhancement provisions are available for the same prior offense, one of which is a section 667 enhancement, the greatest enhancement, but only that one, will apply." (*People v. Jones* (1993) 5 Cal.4th 1142, 1150; accord, *People v. Ruiz* (1996) 44 Cal.App.4th 1653, 1669.) Furthermore, section 1385, subdivision (b), "does not authorize a judge to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under [s]ection 667." (Accord, *People v. Flournoy* (1994) 26 Cal.App.4th 1695, 1702.) In view of these authorities, we conclude (1) the court erroneously imposed both a section 667 enhancement and a section 667.51 enhancement for defendant's prior sodomy conviction; and (2) the section 667.51 enhancement must be stricken.

## DISPOSITION

The Penal Code section 667.51 enhancement for defendant's prior sodomy conviction imposed on each of counts 1 through 7 is stricken. The trial court is directed

to amend the abstract of judgment accordingly and to transmit certified copies thereof to the appropriate authorities.  As so modified, the judgment is affirmed.

_____

DETJEN, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

PEÑA, J.