[No. F055219. Fifth Dist. Sept. 8, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC JAMES LAWRENCE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IA. and II of the Discussion.

## COUNSEL

Victor Blumenkrantz, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, Brian Alvarez and Leslie W. Westmoreland, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, P. J.**—Appellant Eric James Lawrence stands convicted, following a jury trial, of attempted unpremeditated murder, in the commission of which he personally used and intentionally discharged a firearm (Pen. Code,[1] §§ 187, subd. (a), 664, 12022.53, subds. (b), (c), (e)(1); count 1), shooting at an inhabited dwelling (§ 246; count 2), assault with a firearm, in the commission of which he personally used a firearm (§§ 245, subd. (a)(2), 12022.5, subds. (a), (d); count 3), and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count 4).[2] Following a bifurcated court trial, appellant was found to have served two prior prison terms. (§ 667.5, subd. (b).) Sentenced to a total unstayed term of 30 years in prison, he now appeals, raising various claims of instructional and sentencing error. For the reasons that follow, we will remand the matter for correction of sentencing errors, but otherwise affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] Appellant was jointly charged and tried with Arthur Machado. Machado's case is not before us on this appeal.

## FACTS

As of July 1, 2007, Craig Isherwood was staying at Devon Fox's house in Tulare.[3] Fox owned a Jeep Grand Cherokee, which she let appellant use. The night before, Isherwood saw appellant at Fox's house. Appellant had a pistol-grip sawed-off shotgun. Appellant said he had just gotten out of "the pen" and that he was just waiting for somebody to "mess around" with him so that he could shoot the gun.

Early on the morning of July 1, Renee York was at her residence in Tulare when Arthur Machado and appellant arrived in a white Jeep.[4] York was outside, waiting for appellant, who asked what was the matter. York responded that she was upset with a comment Larry Robinson had made to her. Appellant asked what it was, and York explained that Robinson had asked about the "XIV" tattoo on appellant's head. Robinson had asked why, if appellant was White, he had something like that on his head, and had said it meant appellant was a punk. Appellant got angry very quickly and asked if York knew where Robinson lived. Appellant said he was going to go over there and show Robinson what a punk was.

Appellant had York accompany him and Machado to show them how to get to Robinson's residence. On the way, appellant told York that when they got there, she was to knock on the door and bring Robinson outside. Appellant said he was going to "get in an old fashioned ass whoopin." At no time was there any talk about killing anybody. During the approximately five-minute drive to Robinson's residence, York neither saw nor heard mention of a shotgun.

On the date in question, Doris Burleson resided at the Tulare Motel on South K Street. The motel, which was laid out in a horseshoe shape, had a total of 24 units. Units 12 through 15 ran across the bottom of the "U"; Viola Astorga lived in unit 14, while Robinson resided in unit 15. Unit 16, in which Burleson lived, was the first unit starting up one side of the horseshoe.

Burleson and Astorga were in unit 14 when, between 3:30 and 3:45 a.m., a very loud car pulled in the driveway. The loud vehicle, a white Jeep, parked in front of unit 13, almost between units 13 and 14. Burleson exchanged greetings with York as York walked past unit 14.

---

[3] Isherwood was granted use immunity with respect to his testimony.

[4] York was originally charged as an accessory in this case and was facing substantial prison time. She entered into a plea agreement under which a four-year term was suspended, and she was required to serve a year in the county jail and three years' felony probation. She believed that if she did not testify, her probation would be violated and she might go to prison.

York knocked on the door of unit 15, and, when Robinson opened it, asked if he would come outside so they could talk. Robinson stepped out of the room. Appellant, who was by the Jeep, approached Robinson. Burleson heard him yelling something, and the two got into an argument.[5] Appellant threw a punch at Robinson. Although Burleson was unable to tell whether it connected, York, who had jumped into the backseat of the Jeep and lain down because she was scared, heard what sounded like someone getting punched. While she did not see who struck whom, she sat up and saw that Robinson had gone to the ground, while appellant had lost his balance a little. Robinson stood up, and she heard him say something like, " 'well, let me get what I have,' " and something about his baseball bat. He ran toward his door. Although York never saw a bat, Robinson never let go of the door handle, but half of his body went around the door as if he was going to grab whatever was behind it. Burleson saw Robinson run back inside his room, and heard appellant say something like, " 'you're gonna be a punk, bitch.' "

Appellant turned around and Machado, who had also been by the Jeep, handed him a sawed-off shotgun. Burleson said, " 'Oh, my God he has a sawed-off shotgun.' " Appellant and Machado looked at her, then appellant took a few steps, put the gun up by the door to Robinson's room, and pulled the trigger. He was about a foot from the door. York, who did not see how appellant came to have the gun, saw appellant point the gun in the direction Robinson had run, and she lay down again. She heard the gun being fired and saw a big light flash, so she started the Jeep so that when appellant got back in, he could just go. According to York, appellant was still standing by the end of the Jeep, so the gun was pretty far from the door.[6] Only a couple of seconds elapsed between when she saw the gun and when she heard the shot. Robinson never came back out.

Appellant and Machado ran back to the Jeep and left with York. Burleson called 911. Robinson subsequently came out of unit 12. He was holding a bunch of bandages to his side and said he had been shot.

Officers were dispatched to the Tulare Motel at 3:46 a.m. Robinson was hiding in a shed and ran from the uniformed officers, who had to use physical force to detain him. He had been shot in the back. Burleson saw a hole about the size of a softball in the door of unit 15. The insulation from the door was blown across the room and there were BB's all over the floor.

Appellant, York, and Machado drove to Devon Fox's house and went into the kitchen. According to Isherwood, appellant had the shotgun and said he

---

[5] According to York, Robinson met appellant in front of unit 14. She believed appellant said something like, " 'you want to call me a punk?' "

[6] A defense investigator subsequently took measurements and determined that from the center of one unit's threshold to the center of another was 24 feet.

had just shot somebody. He was sweating profusely, as if he had been running, and seemed very nervous. He said he had to change his shirt and get the gunpowder residue off his arms. As he was washing himself, he kept saying " 'I shot the mother fucker. Yeah, I shot him.' " He almost seemed happy about it. Machado looked like he was going to be sick and kept repeating that he could not believe appellant shot " 'that guy.' " According to York, appellant was "freaking out." He was yelling that he could not believe what just happened, because it was not supposed to go like that. He was trying to wash his arms. He was not saying anything that sounded like bragging.

Isherwood subsequently told police that Machado wiped down the Jeep to get rid of any fingerprints. According to York, however, Fox cleaned out the Jeep. Machado asked York if she could find him a ride out of there. She told him to calm down, that she was getting all three of them a ride. A van pulled up and the three got in and left. The shotgun was returned to its owner.

Early on the morning of July 1, sometime after she had heard a gunshot, Cynthia Marlow saw Machado at the Wilson Cottages, on South K Street, near the Tulare Motel. Appellant and Renee York had been with him in the car, but they left.[7] Machado was pacing back and forth "and kinda freaking out." Machado said there were a lot of cops at the Tulare Motel. Because Marlow had a friend who lived there, Machado told her to go down there and see what was going on. When Marlow did, she saw Doris Burleson. According to Burleson, Marlow said to her, " 'This is what happens to people that point.' "

Marlow was arrested for threatening Burleson. When Marlow and York were in a holding cell near the one in which Machado and appellant were located, appellant apologized to York for getting her involved and said he should not have done it.

## DISCUSSION

## I

### JURY INSTRUCTION ISSUES

A. *Failure to Instruct on Lesser Included Offense*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[7] York denied seeing Marlow that morning.
[*]See footnote, *ante*, page 547.

B. *CALCRIM Nos. 105 and 226*

CALJIC No. 2.20 (believability of witness) tells jurors, in pertinent part: "You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness." CALJIC No. 2.21.2 (witness willfully false) provides: "A witness, who is willfully false in one material part of his or her testimony, *is to be distrusted* in others. *You may reject the whole testimony* of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." (Italics added.)

The substance of these instructions is contained in CALCRIM Nos. 105 and 226, which were given in appellant's case.[10] In pertinent part, appellant's jury was told: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. The testimony of each witness must be judged by the same standard. . . . You may believe all, part, or none of a witness'[s] testimony. Consider the testimony of each witness and decide how much of it you believe. [¶] . . . [¶] If you decide that a witness deliberately lied about something significant in this case, *you should consider not believing anything* the witness says; or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." (Italics added.)

Appellant contends that the "weakened" language of CALCRIM Nos. 105 and 226 fails adequately to convey to jurors that a witness who is willfully false in a material part of his or her testimony is to be distrusted in other parts, and that his or her whole testimony can be rejected. He argues that the CALJIC instructions obligate the jury to distrust—hence, disbelieve—a false witness and so put the burden on the witness to prove that some parts of his or her testimony are true, whereas the CALCRIM instructions merely give jurors the option of disbelieving, without telling them that the policy of the law is that the witness *should* be disbelieved unless parts of his or her testimony seem to be true. The result of giving his jury the CALCRIM instructions, appellant says, was prejudicial error.[11]

---

[10] CALCRIM No. 105 was given as part of the preinstructions. CALCRIM No. 226 was given prior to deliberations. Although the challenged language is the same in each, we quote the trial court's reading of CALCRIM No. 226.

[11] As an initial matter, we reject respondent's contention that any claim of error was forfeited by appellant's failure to object at trial or to request modification or clarification. "[A] defendant need not assert an objection to preserve a contention of instructional error when the error affects the defendant's 'substantial rights.' (§ 1259.) In this regard, '[t]he cases equate "substantial rights" with reversible error' under the test stated in *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. [Citation.]" (*People v. Felix* (2008) 160 Cal.App.4th 849, 857 [72 Cal.Rptr.3d 947]; see *People v. Mitchell* (2008) 164 Cal.App.4th 442, 465 [78 Cal.Rptr.3d

■ The California Supreme Court and numerous Courts of Appeal have long held that CALJIC No. 2.21.2 and its predecessor, CALJIC former No. 2.21, correctly state the law. (E.g., *People v. Beardslee* (1991) 53 Cal.3d 68, 94 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People v. Lang* (1989) 49 Cal.3d 991, 1023 [264 Cal.Rptr. 386, 782 P.2d 627]; *People v. Vang* (2009) 171 Cal.App.4th 1120, 1130 [90 Cal.Rptr.3d 328]; *People v. Foster* (1995) 34 Cal.App.4th 766, 772 [40 Cal.Rptr.2d 633].) The "distrust" language contained therein has as its source Code of Civil Procedure former section 2061, subdivision 3, which required jurors to be instructed " '[t]hat a witness false in one part of his testimony is to be distrusted in others.' " (*Florez v. Groom Development Co.* (1959) 53 Cal.2d 347, 356, fn. 1 [1 Cal.Rptr. 840, 348 P.2d 200].) Code of Civil Procedure former section 2061 was repealed in 1965, effective January 1, 1967. Although the "distrust" language was not carried over into a different code section, the cautionary instructions on evidence and witnesses that Code of Civil Procedure former section 2061 listed were derived from the common law and so the repeal was seen as having "no effect on the giving of the instructions contained in the section . . . ." (Cal. Law Revision Com. com., 21A West's Ann. Code Civ. Proc. (2007 ed.) foll. § 2061, p. 608; see *People v. Hampton* (1999) 73 Cal.App.4th 710, 722 [86 Cal.Rptr.2d 665].)

We do not understand this to mean, however, that the wording of the jury charge is immutable. This court has previously rejected the argument that CALJIC instructions "serve as the benchmark by which to adjudicate the correctness of CALCRIM instructions," observing that "CALCRIM instructions are now 'viewed as superior' to CALJIC instructions. [Citation.]" (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1188 [67 Cal.Rptr.3d 871].) We have also been unpersuaded "that semantic differences between CALCRIM No. 226 and CALJIC No. 2.21.2 are even material, let alone prejudicial" (*People v. Warner* (2008) 166 Cal.App.4th 653, 659 [82 Cal.Rptr.3d 911]), ironically in a case in which the defendant argued that CALCRIM No. 226 encouraged jurors to reject his own entire testimony.

■ CALCRIM Nos. 105 and 226, like CALJIC No. 2.21.2, have the purpose of " 'set[ting] out a commonsense principle for evaluating witness credibility.' [Citation.]" (*People v. Vang, supra*, 171 Cal.App.4th at p. 1130.) The instructions "allow[] the jury to disbelieve a witness who deliberately

---

855].) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim . . . ." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 [32 Cal.Rptr.2d 442].) As for the general rule that "a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language" (*People v. Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285]), we read appellant's arguments as going beyond a claim CALCRIM Nos. 105 and 226 were merely incomplete, and instead asserting they were not "correct in law."

lies about something significant because experience has taught us that a deliberate liar cannot be trusted." (*Ibid.*) In our opinion, this is what the "distrust" language of CALJIC No. 2.21.2 is meant to convey, not that there is somehow a presumption, burden, or legal policy the witness (or party propounding the witness's testimony) must overcome. If anything, CALCRIM Nos. 105 and 226 are phrased so as to be more beneficial to a defendant than the CALJIC instruction in situations where jurors might find a witness who gives testimony favorable to the defense to have deliberately lied about something.[12] Accordingly, we find no infirmity in the wording of CALCRIM Nos. 105 and 226, and conclude they were properly given in the present case.

In reaching this conclusion, we reject appellant's claims of constitutional error. First, appellant says that because CALJIC No. 2.21.2 had its origins in common law, the failure to give it or an instruction with equivalently strong language deprived him of a state-created procedural right and denied him due process of law under *Hicks v. Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227]. That case, which dealt with a defendant who was subjected to a mandatory prison sentence under a statute later declared unconstitutional, and who was denied the right to have his punishment fixed by the jury as required by state law (*id.* at pp. 344–346), is inapposite. The jurors in appellant's case were instructed concerning how to evaluate witness credibility. State law did not entitle appellant to have them instructed with any particular language.

Second, appellant says the giving of CALCRIM Nos. 105 and 226, instead of a CALJIC No. 2.21.2-type instruction, constituted a failure to instruct on the defense theory of the case, thus denying him a fair trial and due process. Appellant fails to explain why this is so, but cites *Conde v. Henry* (9th Cir. 1999) 198 F.3d 734 in support. In that case, in which the defendant was charged with kidnapping for the purpose of robbery, the trial court precluded defense counsel from arguing to the jury that the prosecution failed to prove a robbery or an intent to rob; refused to instruct on simple kidnapping; and reduced the prosecution's burden to show specific intent to take property from the victim or her immediate presence by modifying the pattern instruction requiring " 'specific intent to rob [the victim]' " to the expansive " 'specific intent to rob [the victim] of money over which she had control.' " (*Id.* at pp. 739–740.) No such error occurred in the present case; defense counsel was free to argue that jurors should completely distrust and reject Isherwood's testimony in its entirety. (See *People v. Vang, supra,* 171 Cal.App.4th at p. 1131.)

---

[12] In the present case, appellant appears to assume the instructions could only have been found applicable to Craig Isherwood. It is possible, however, that jurors could also have found Renee York to have lied. Although called as a witness by the prosecution, some of York's testimony was favorable to appellant, especially with respect to issues of premeditation and heat of passion.

Third, appellant says the giving of CALCRIM Nos. 105 and 226 lowered the prosecution's burden of proof and permitted a conviction that rested on insufficient evidence, thereby denying him due process. Again, appellant fails to explain how this is so, especially since, even under CALJIC No. 2.21.2, jurors are not required to reject the testimony of a witness who deliberately lied. The cases cited by him—*Jackson v. Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781], which sets out the standard of review for a claim of insufficiency of the evidence to support a conviction (*id.* at p. 319) and *Carella v. California* (1989) 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419], which deals with jury instructions that lighten the prosecution's burden of proof by imposing mandatory conclusive presumptions concerning elements of the offense (*id.* at pp. 265–266)—do not apply.

## C.   CALCRIM No. 600

■  "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176].) Pursuant to CALCRIM No. 600, the trial court here told jurors that in order to prove a defendant was guilty of attempted murder, the People had to prove the defendant took direct but ineffective steps toward killing another person, and the defendant intended to kill that person. The court further instructed: "A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. *A direct step indicates a definite and unambiguous intent to kill.* It is a direct movement towards the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstances outside the plan had not interrupted an attempt." (Italics added.)

Appellant says the emphasized portion erroneously and prejudicially conflated the mental state and act requirements of the crime, and suggested to jurors that once they found appellant took a direct step toward the killing of another—e.g., fired the shotgun at Robinson—they had also found the requisite intent to kill. Appellant claims the mental state requirement was deemphasized, and the jury was discouraged from properly considering and weighing all of the conflicting evidence concerning intent to kill. He also claims the instruction encouraged jurors to apply an objective, rather than

subjective, standard in determining appellant's state of mind, and lessened the prosecution's burden of proof.[13]

■ We conclude CALCRIM No. 600 correctly states the law. The challenged language is virtually identical in meaning to the analogous portion of CALJIC No. 8.66 (attempted murder), which states: "However, acts of a person who intends to kill another person will constitute an attempt *where those acts clearly indicate a certain, unambiguous intent to kill.*" (Italics added.) That portion of CALJIC No. 8.66 was derived from the more general attempt instruction, CALJIC No. 6.00 (attempt—defined). (See *People v. Beck* (2005) 126 Cal.App.4th 518, 522 [24 Cal.Rptr.3d 228].) The California Supreme Court has held that CALJIC former No. 6.00, which instructed in pertinent part that acts are sufficient when they " 'clearly indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design,' " correctly stated the law. (*People v. Dillon* (1983) 34 Cal.3d 441, 452–453 [194 Cal.Rptr. 390, 668 P.2d 697].) We see no substantive difference between the language of CALCRIM No. 600 and the language approved in *Dillon.*

When the challenged portion of CALCRIM No. 600 is considered in context, it is clear there is no reasonable likelihood jurors understood it as appellant asserts. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475]; *People v. Frye* (1998) 18 Cal.4th 894, 957 [77 Cal.Rptr.2d 25, 959 P.2d 183], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) The instruction as a whole makes it clear that in order to find an attempt, the jury must find two distinct elements: an act and an intent. These elements are related; usually, whether a defendant harbored the required intent to kill must be inferred from the circumstances of the act. (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207–1208 [18 Cal.Rptr.3d 167].) Read in context, it is readily apparent the challenged language refers to the act that must be found, and is part of an explanation of how jurors are to determine whether the accused's conduct constituted the requisite direct step or merely insufficient planning or preparation.

## II

### Sentencing Issues[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[13] Respondent claims, by way of footnote included in his discussion of CALCRIM Nos. 105 and 226, that appellant forfeited his claim of error with respect to CALCRIM No. 600 for the same reasons respondent asserted with respect to CALCRIM Nos. 105 and 226. We reject this argument for the reasons set out in footnote 11, *ante.*

[*] See footnote, *ante,* page 547.

## DISPOSITION

The matter is remanded with directions to the trial court to (1) stay the sentence on count 4, and (2) exercise its discretion to impose or strike the second enhancement found true under section 667.5, subdivision (b). In all other respects, the judgment is affirmed.

Vartabedian, J., and Cornell, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 17, 2009, S177059. Baxter, J., did not participate therein.