Filed 9/29/16  P. v. Ware CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B266255 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA421346) |
| TREMAYNE WARE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Roberta L. Davis and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Tremayne Ware of the premeditated first degree murder of Clay Casey (Pen. Code, § 187, subd. (a)) with a firearm (§ 12022.53, subds. (b), (c), and (d)), and the attempted murders (§§ 664/187, subd. (a)) of Felicia Medford and Deandra Foster.[1] He admitted a prior strike conviction, and was sentenced to 50 years to life on the murder count, plus 25 years for firearm use. On the attempted murder counts, he was sentenced to one consecutive term of 18 years, and a second consecutive term of four years, eight months. He appeals from the judgment of conviction, contending that the trial court erred in not adequately instructing on the so-called "kill zone" theory, and in permitting the prosecution's firearm expert to testify shell casings found at the murder scene and a bullet recovered from Casey's body were fired from the gun recovered from defendant. We disagree with these contentions, and affirm the judgment.

## BACKGROUND

*Prosecution Evidence*

Around midnight on February 9, 2014, after attending a nightclub to watch a family member play, Kysean Smith and other family members returned to a parking structure on Shatto Place in Los Angeles where they had parked. The group included Clay Casey (Smith's father), Felicia Medford (Smith's mother), Deandra Foster (Smith's cousin), and Lauren Lucas (Smith's wife). Casey got in his Chevrolet Suburban as the driver, with Foster in the right front passenger seat

---

[1]    In the attempted murder counts, the jury found not true allegations of premeditation and deliberation (§ 664, subd. (a)) and of firearm use (§ 12022.53, subds. (b), (c), and (d)). The jury also convicted defendant of two counts of assault with a semiautomatic firearm as lesser included offenses in the attempted murders, but the trial court later dismissed those charges. Undesignated section references are to the Penal Code.

2

and Medford in the passenger seat behind Casey.  Smith got into his Dodge Charger with Lucas.

As Casey was pulling out of the lot, defendant approached the driver's side of Casey's Suburban, and from about seven feet away began firing repeatedly into the vehicle.  Lucas heard seven gunshots.  Smith heard approximately 10.  Foster heard seven or eight shots.  Casey's Suburban rolled forward and crashed into a gate.

Casey was struck five times — four bullets entered the left side of his body, the fifth wound was a graze wound to his hand.  Casey later died from his wounds.  Foster was shot once in the buttocks.  Medford was shot in both legs.

Lucas and Smith observed the shooting and at trial identified defendant as the shooter.  As defendant fled on foot, Smith and Lucas gave chase in Smith's car.  Meanwhile, Los Angeles Police Officers Matthew Oropeza and Adam Garcia were on patrol in the area when they heard the gunshots.  They observed defendant running on Shatto Place toward Wilshire.  Defendant stopped and tried to hide behind an electrical box as additional police units arrived, and then tried to mingle innocently with others on the street.  When the officers illuminated the area, defendant fled and the officers pursued him on foot.

Smith and Lucas observed the police vehicles and officers in the intersection at Wilshire and Shatto Place.  Smith told the officers that defendant had shot Casey, and when defendant ran, Smith continued to pursue him in the Dodge Charger.

Defendant ran across Wilshire to Westmoreland Street, where Smith caught up to him.  Defendant made eye contact with Smith and fumbled for something at his waist.  Believing defendant was reaching for a weapon, Smith ran defendant down with his car, then crashed into a wall.

3

Officer Garcia searched defendant, and recovered a nine-millimeter Taurus semiautomatic handgun from his right front sweatshirt pocket. There was one round in the chamber; the magazine was empty. Paramedics arrived and took defendant to the hospital.

Among the evidence recovered at the scene of the shooting on Shatto Place were an expended bullet, and eight nine-millimeter shell casings. Two bullets were recovered from Casey's body.

As here relevant, Los Angeles Police criminalist Kathleen Alvarado, a firearms examination expert, performed tests to determine whether the shell casings found at the scene, and the two bullets removed from Casey's body, were fired by the nine millimeter pistol recovered from defendant. She explained that she test fired the gun into a water tank, and microscopically compared the test fired casings and bullets to the casings and bullets in evidence. She looked for small individualized characteristics in the tool marks imprinted by the gun (firing pin impressions on the cartridges, lands and grooves on the bullets left by the barrel) so as to determine whether sufficient similarity existed between the test fired casings and bullets and those in evidence to draw a conclusion they were fired by the same gun. She determined that all those items in evidence except one of the bullets from Casey's body were fired by the firearm recovered from defendant. As to the remaining bullet, her testing was inconclusive. Alvarado had "no doubt" about her conclusions, which were verified by a second examiner and her supervisor.

*Defense Evidence*

Los Angeles Police Officer Juan Del Rio spoke with Foster on the night of the shooting. She said that the suspects fled in a gold-colored sedan vehicle in a southbound direction. Foster was in distress and pain, having just been shot,

4

sustaining a wound to her buttocks, and was afraid the wound would be life threatening. She was standing near where the Suburban had come to a stop, then collapsed.

## DISCUSSION

### I. *Kill Zone*

As relevant to the attempted murder counts, defendant contends that the trial court incorrectly instructed the jury on the kill zone theory pursuant to CALCRIM No. 600, and in response to a jury question, because the court failed to adequately instruct on the intent element of attempted murder and the meaning of a "kill zone." We disagree.

### A. *Relevant Proceedings*

The trial court instructed the jury on attempted murder using CALCRIM No. 600. In relevant part, the court instructed: "The defendant is charged in counts two and three of the information with attempted murder. To prove that the defendant is guilty of attempted murder, the People must prove that: (1) the defendant took at least one direct but ineffective step towards killing another person; and (2) the defendant intended to kill that person. The doctrine of 'transferred intent' as explained in instruction 562 does not apply to the crime of attempted murder."[2]

---

[2] The trial court also gave CALCRIM No. 562, instructing in pertinent part that, as to count 1 only (the murder count), and exclusive of counts 2 and 3, if appellant "intended to kill one person, but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed."

5

The court also gave the portion of CALCRIM No. 600 applicable to the kill zone theory: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm around the intended victim. This particular zone is called the 'kill zone.' In order to convict the defendant of the attempted murder of Felicia Medford, the People must prove that the defendant not only intended to kill Clay Casey but that he also intended to kill Felicia Medford, or intended to kill everyone within the 'kill zone'. If you have a reasonable doubt whether the defendant intended to kill Felicia Medford or intended to kill Felicia Medford by killing everyone in the 'kill zone', then you must find the defendant not guilty of the attempted murder of Felicia Medford. In order to convict the defendant of the attempted murder of Deandra Foster, the People must prove that the defendant not only intended to kill Clay Casey but that he also either intended to kill Deandra Foster, or intended to kill everyone within the 'kill zone'. If you have a reasonable doubt whether the defendant intended to kill Deandra Foster or intended to kill Deandra Foster by killing everyone in the 'kill zone', then you must find the defendant not guilty of the attempted murder of Deandra Foster."

On the second day of deliberations, the jury sent a note to the court asking several questions regarding the instructions, including: "Define kill zone – Is there a bound[ary] to the zone? For example [is it] limited to the driver's seat. Is the bound[ary] defined by where the intended target is seated?" The jury also asked if attempted murder required intent.

The court conferred with the parties on how to respond. Defense counsel objected to the court's proposed response (which is not included in the record on appeal). Defense counsel conceded that a kill zone "may not be a geographical boundary . . . or physical boundary, but I think to inform them that they can't use

the . . . natural physical boundaries within an area where the shooting occurred gets into their deliberative process. If they've decided that the zone of killing was the front driver's seat then . . . anything outside of that zone . . . may not be an intended area." Defense counsel asked the court to delete certain language, but "include the language from the instruction itself [referring to CALCRIM No. 600, which had been modified to name the victims] as the People must prove the defendant not only intended to kill Mr. Casey but also either intended to kill Felicia Medford and/or Deandra Forster or intended to kill everyone within the kill zone." The court declined to use the victims' names in defining a kill zone, noting that cases explaining the kill zone principle refer generically to intending to kill an intended victim by killing everyone within that area.

After conferring with the parties, the court sent a written response to the jury, as follows: "Attempted murder requires a specific intent to kill. That specific intent to kill may be directed at either a particular individual or everyone within the so-called 'kill zone.' You are referred to Instructions 252[12] and 600 for further explanation of this concept. [¶] As used in the instructions in this case, the term 'kill zone' defines an area in which the perpetrator intended to kill an intended victim by killing everyone within that area. You are referred to Instruction 600 for further explanation of this concept."

B. *Analysis*

Relying primarily on Justice Werdegar's dissent in *People v. Smith* (2005) 37 Cal.4th 733, 745-747 (*Smith*), defendant contends that CALCRIM No. 600's definition of a kill zone, and the trial court's response to the jury's question, were inadequate, in that they failed to tell the jury that the concept requires a focus on the nature and scope of attack, and in particular "(1) whether the fact finder can

7

rationally infer from the type and extent of force employed in the defendant's attack on the primary target that the defendant intentionally created a zone of fatal harm, and (2) whether the nontargeted alleged attempted murder victim inhabited that zone of harm. [Citation.]" (*Smith, supra*, 37 Cal.4th at pp. 755-756, dis. opn. of Werdegar, J., relying upon *Harrison v. State* (2004) 382 Md. 477, 495.)

Initially, we note that CALCRIM No. 600 correctly states the law of attempted murder. (*People v. Lawrence* (2009) 177 Cal.App.4th 547, 557.) Defendant did not object to CALCRIM No. 600, and did not request any modification. Moreover, to the extent he requested changes to the court's proposed response to the jury's question regarding the kill zone, he did not propose the modifications urged by defendant on appeal, and wanted to incorporate the language of CALCRIM No. 600 as given to the jury. Thus, the issue whether the court adequately instructed on the kill zone theory has been forfeited. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024.)

In the alternative, even if the claim were not forfeited, we would reject it. First, CALCRIM No. 600 and the court's response to the jury's question on the kill zone principle were consistent with our Supreme Court's description of the principle. "[T]he fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within . . . the 'kill zone.'" (*People v. Bland* (2002) 28 Cal.4th 313, 329 (*Bland*).) The kill zone theory "simply recognizes that a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing

8

of that victim." (*People v. Smith, supra,* 37 Cal.4th at pp. 745-746.) The theory "is not a legal doctrine requiring special jury instructions. . . . Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland, supra,* 46 Cal.4th at p. 331, fn. 6; see *People v. Stone* (2009) 46 Cal.4th 131, 137.) Here, consistent with these principles, CALCRIM No. 600 (and the court's response to the jury's question) simply informed the jury of the kill zone principle, and properly left to the jury the determination whether it could reasonably be inferred from the evidence that defendant intended to kill Casey by killing everyone in the car.

Second, in her *Smith* dissent, Justice Werdegar did not suggest that the trial court should instruct on the specific circumstantial evidence reasoning process – Does the type and extent of force create a zone of fatal harm? Is the untargeted victim in that zone? — for the jury to properly consider whether a defendant possessed a concurrent intent to kill an intended target and anyone else in the kill zone. In *Smith,* the defendant fired a single shot at a vehicle driven by a mother, whose infant son was in the line of fire seated directly behind her. (37 Cal.4th at p. 736.) The jury was not instructed on the kill zone principle. (*Id.* at p. 746.) On appeal, the defendant contended that the evidence was insufficient to support his conviction of attempted murder of the son. The *Smith* majority, for reasons not here relevant, and expressly not relying on the kill zone theory, concluded the evidence was sufficient. (*Id.* at pp. 736, 746-747.) In dissent, Justice Werdegar used her analytical model of the kill zone theory as one rationale to assert that the evidence was not sufficient to support a conviction of attempted murder of the infant son. (*Id.* at pp. 755-757 (dis. opn. of Werdegar, J.).) Her discussion had nothing to do with a jury instruction on the kill zone.

9

Third, defendant's challenge to CALCRIM No. 600 and the court's response to the jury's question regarding the kill zone principle is, at base, a challenge to the holding of *Bland.* According to defendant, *Bland's* kill zone reasoning is a thinly veiled disguise for improperly applying the doctrine of transferred intent to attempted murder (the doctrine applies to murder, but not attempted murder), and *Bland's* conclusion that no special instruction is needed is undercut by the jury's question in the instant case. Of course, *Bland's* holding is binding on this court, and defendant cited no binding authority that undercuts it. Moreover, the jury was expressly instructed that the transferred intent doctrine stated in CALCRIM No. 562 applied only the murder charge and not to the attempted murder charges (CALCRIM No. 600: "The doctrine of 'transferred intent' as explained above in instruction 562 does not apply to the crime of attempted murder"; CALCRIM No. 562: "The following instruction [on transferred intent] applies only to the crime charged in Count One . . . murder. It does not apply to the crime of attempted murder, as alleged in Counts Two and Three.").

In sum, defendant forfeited his challenge to the adequacy of instructions on the kill zone principle, and in any event the instructions were correct.


II. *Ballistics Evidence*

Defendant contends that the trial court erred in admitting the testimony of firearms expert criminalist Kathleen Alvarado that, by comparing toolmarks on test fired bullets and casings to the casings found at the scene and one bullet taken from Casey's body, she concluded that the firearm recovered from defendant fired them all. We disagree.

Before trial, defendant moved in limine to exclude any testimony related to firearm toolmark comparison under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*),

10

and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579. Defendant argued that toolmark analysis had not been subject to scientific testing or formal peer review and was not generally accepted in the scientific community. He relied on a published article, Tobin and Blau, *Hypothesis Testing of the Critical Underlying Premise of Discernible Uniqueness in Firearms-Toolmarks Forensic Practice* (2013), 53 Jurimetrics 121.

At the hearing on the motion, defense counsel asked that toolmark evidence be excluded, but if not, that the prosecutor be limited to eliciting testimony that the markings on the casings found at the scene and one of the bullets from Casey's body were "consistent" with having been fired from the handgun recovered by defendant. The trial court denied the motion to exclude the firearms evidence. It reasoned that the Tobin and Blau article did not raise a doubt as to the validity of firearm toolmark analysis. But even if it did, the decision in *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*) upheld the use of such evidence, and under *People v. Venegas* (1998) 18 Cal.4th 47, once a published appellate decision has upheld the admission of evidence, there is no need to conduct a hearing on reliability unless prevailing scientific opinion has materially changed. Nothing in the Tobin and Blau article indicated a change in the prevailing scientific theory. The court further denied the request that the prosecution be limited to eliciting testimony that the toolmark comparison showed only a consistency between the examined evidence and the firearm.

On appeal, defendant contends that the trial court erred in admitting Alvarado's testimony. He is wrong. First, as he concedes, firearm identification evidence has long been admissible in California, and is excludable under *Kelly, supra*, which applies only to "new scientific techniques." (*People v. Leahy* (1994) 8 Cal.4th 587, 605.)

11

Second, the decision in *Cowan, supra,* 50 Cal.4th at page 470 disposes of his claim. In *Cowan,* using a mold of a gun barrel, the firearms expert made a comparison of bullets taken from the murder victim's body to the mold, and concluded that the bullets had been fired from that gun. (*Id.* at p. 468.) The Supreme Court held that this technique did not require a *Kelly* hearing on its reliability because toolmark comparisons are not a new scientific technique. Further, the technique used in *Cowan* "merely 'isolate[d] physical evidence' — specifically, the pattern of lands and grooves and associated imperfections on the inside of the Colt pistol's barrel, as well as the corresponding markings on the recovered bullets — 'whose . . . appearance, nature, and meaning [were] obvious to the senses' of the lay jurors" (*id.* at p. 471), and thus would not contravene the purpose of the *Kelly* rule (i.e., "to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not." (*People v. Webb* (1993) 6 Cal.4th 494, 524.)

*Cowan* is controlling regarding admission of Alvarado's testimony that the gun recovered from defendant fired the shell casings found at the murder scene and one bullet taken from Casey's body. Defendant contends, however, that because *Cowan* did not consider the literature reevaluating the reliability of toolmark comparisons,[3] it is not authority for the admissibility of Alvarado's testimony. The assertion begs the question: *Cowan* holds that toolmark comparison evidence is not subject to challenge on the basis of its purported unreliability under *Kelly* ("there

---

[3] Defendant engages in a lengthy discussion on the subject, with citations to, among other articles, National Research Council, *Strengthening Forensic Science in the United States: A Path Forward*, 150-155 (2009), Schwartz, *A Systematic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification* (2005) 6 Colum. Sci. & Tech. L. Rev. 1, and the Tobin and Blau article presented in the trial court.

12

was no need to debate the reliability of the method under . . . *Kelly.*" (*Cowan, supra,* 50 Cal.4th at p. 471.) In short, Alvarado's testimony was admissible.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.