Filed 8/10/22 P. v. Diaz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094110 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE021059) |
| v. | |
| FRANK DIAZ, | |
| Defendant and Appellant. | |

Defendant Frank Diaz had his stepdaughter A. masturbate him on multiple occasions, beginning when A. was eight or nine years old and continuing until she reported it when she was 13 years old. As a result, defendant was convicted of two counts of lewd acts on a child under the age of 14 (Pen. Code, § 288, subd. (a))[1] (counts one and two), and four counts of lewd and lascivious acts on a child under the age of 14 by either duress (counts three, four, and five) or force (count six) (§ 288, subd. (b)(1)) and sentenced to a 40-year state prison term.

---

[1] Undesignated statutory references are to the Penal Code.

1

Defendant contends on appeal: (1) the convictions for lewd acts by duress in counts three through five must be reversed for insufficient evidence because the means used to get A. to masturbate defendant—withholding or ending A.'s punishment—is not duress; (2) the flight instruction was not supported by the evidence and the failure to object to the instruction was ineffective assistance; (3) we should review for *Brady*[2] material A.'s Child Protective Services (CPS) records that were delivered to the trial court; and (4) the Government Code section 29550.2 main jail booking and classification fees must be vacated in light of Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 92, § 25; Assembly Bill 1869).

Sufficient evidence supports the convictions in counts three through five because the means defendant used to get A. to assent to her molestation—forgoing punishment she would otherwise be subject to—constitutes duress in light of the surrounding circumstances. The flight instruction was warranted here, so counsel's failure to object to it was not ineffective assistance. Defendant has forfeited the *Brady* claim by not following the procedure set forth in Welfare and Institutions Code section 827 requiring him to petition the juvenile court for the files in question; we therefore need not review them for possible *Brady* material. Agreeing with defendant's contention regarding Assembly Bill 1869, we shall strike the booking and classification fees and affirm the modified judgment.

## I. BACKGROUND

As of June 2019, defendant and A.'s mother had been together for about 11 years and lived together with her 13-year-old daughter A. A. considered defendant to be her stepfather. A's grandmother periodically lived with defendant, A.'s mother, and A.

---

[2] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

On the morning of June 28, 2019, defendant entered A.'s room while wearing only a towel. A. was in bed at the time; she hid her face behind a stuffed animal. Defendant got onto the bed, grabbed A.'s hand, and put it on his penis as defendant forced her to masturbate him until he ejaculated. Defendant tried to wipe the semen off of A.'s bed and then left her room.

A. immediately texted her grandmother that defendant had molested her. A. texted her grandmother: " 'When [defendant] came in I was sleeping, and I didn't wake up because I was scared, and he grabbed my hand, and used it to jerk himself off. I'm scared right now, and mom is at work.' " A.'s grandmother left to pick up A., after which she called the police.

A. got some of her belongings and waited outside for her grandmother. Defendant went outside three times, each time asking A. why she was outside. Defendant asked A. if she wanted him to go to jail. He started to panic; defendant threw up in the sink and cut himself on the arm with a kitchen knife. As he cut himself, defendant said, " 'I can't go to jail. I'm going to die.' "

Defendant said he was going to say goodbye to his parents and children. He went to his room, came out, put his car keys and wallet on the table, said it was for A's mother, and left. Later, before A.'s grandmother picked her up, defendant returned to the apartment and took his keys and wallet.

As this happened, A.'s grandmother was receiving text messages from defendant asking whether she was " 'going to call the cops' " and whether she had called them. Defendant also texted, " 'Please help me. I'm so sorry and disgusted with myself. I don't know why. Never again. I'm so, so sorry' "; and " 'You know this isn't me. I made a bad mistake. Please forgive me.' "

A. left to live first with her aunt and then with an uncle because her mother would not leave defendant and CPS would remove her from the home if defendant still lived

3

with her.  A. told her grandmother about other incidents of molestation after she no longer lived with defendant.

A. testified that defendant started sexually abusing her when she was eight or nine-years old.  The abuse increased over time; by the time she was 11 years old, it happened weekly.  Whenever A. got into trouble for bad grades or not doing chores, defendant would tell A. to stroke and touch his penis to get out of trouble.  According to A., "I used to, like, get in trouble, and he would make me touch him, touch his penis to get out of trouble."  Defendant also would hit, poke, push, or slap A. when she got into trouble.  Other punishments for A. included losing her phone and being grounded.  The sexual abuse happened so often that A. knew she would have to touch A.'s penis to get out of trouble.  She often got her phone back or other privileges reinstated after masturbating defendant.  Defendant also hit A.'s mother and would yell at A.  He also would rub A.'s thigh or touch her breasts or buttocks.

A. tried to tell her mother about the sexual abuse when she was eight or nine years old by saying that she did not like defendant, but her mother appeared to not understand.  A. told no one else until she told her grandmother in 2019.

During jail visits between defendant and A.'s mother, defendant told A.'s mother to turn off the internet to keep A. and her grandmother from communicating with each other.  He also told A.'s mother to lock all of the doors and not answer if someone came knocking.

A stain on A.'s bedsheet and blanket tested positive for seminal fluid, but no sperm cells were present.  A lack of sperms cells indicates a vasectomy, which defendant had.  Defendant's DNA was found on the seminal stain from the blanket.

4

## II.  DISCUSSION

A.     *Sufficiency of the Evidence of Duress for Counts Three Through Five*

Defendant contends there is insufficient evidence of duress to support the convictions for sexual abuse of a minor through duress (§ 288, subd. (b)(1)) in counts three through five.  We disagree.

The standard of review for insufficient evidence claims is well-established.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]  We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

Section 288, subdivision (b)(1) prohibits lewd and lascivious acts on a child under the age of 14 "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."  Defendant was prosecuted under this provision in counts three through five under a duress theory for acts committed on A. when she was 13 years old.  The prosecutor argued that for a 13-year-old girl like A., "if you've been grounded, you are not allowed to go out, you've had your phone taken away, and you are in trouble, that's a hardship.  And she's learned and been taught by the defendant that the only way to get out of that is to touch his penis, to stroke it, to be gentle, to follow his instructions on how to touch his body, on how to manipulate his penis to end the hardship that she's experiencing."

5

As used in section 288, subdivision (b)(1), duress is defined as " 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13; accord, *People v. Leal* (2004) 33 Cal.4th 999, 1004-1005, 1009-1010.) " 'The total circumstances, including the age of the victim, and [her] relationship to defendant are factors to be considered in appraising the existence of duress.' " (*Cochran, supra*, at pp. 13-14.) "Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family." (*Id.* at p. 14; see also *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1319-1320; *People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1578-1579 (*Wilkerson*).) This is an objective standard. (*People v. Soto* (2011) 51 Cal.4th 229, 246.) Accordingly, "[t]he fact that the victim testifies the defendant did not use force or threats does not preclude a finding of duress." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072.)

Defendant likens his actions here to using a reward to induce the victim to assent to the molestation. He says the use of a reward and inducement lacks a threat of hardship, a necessary component of duress. According to defendant, while it would have been duress if he were to compel A. through the threat of punishment such as taking her phone away or refusing to let her see her boyfriend, rescinding such punishments she was already subject to if she agreed to be molested did not impel her to act to avoid a negative consequence if she refused to comply. We are unpersuaded. We must consider the totality of the circumstances, including the age of the victim and her relationship to defendant. A. testified defendant grounded her a lot; she was often in trouble and in her room most of the time. Defendant would make her touch his penis to get out of trouble. The jury could have reasonably inferred from this evidence that, by maintaining

6

punishment until A. masturbated him, defendant used ongoing punishment as an ongoing threat of hardship to get A. to perform an act she otherwise would have not done. This is duress.

The case defendant primarily relies upon, *Wilkerson,* does not support a different conclusion. The defendant in *Wilkerson* repeatedly molested his 12-year-old granddaughter and her 12-year-old friend. (*Wilkerson, supra*, 6 Cal.App.4th at p. 1575.) When asked why she engaged in the molestation, the granddaughter replied that the defendant would spoil her and give her what she wanted if she asked, and that she was afraid of defendant, "who drank a lot and would become violent when drinking." (*Ibid*.) The friend said the molestation happened when defendant was drinking and became violent, that she was afraid of him, but would also offer the girls money to engage in sexual acts with him. (*Ibid*.) The defendant in *Wilkerson* contended the trial court erred in denying his motion to withdraw his no contest plea because there was insufficient evidence of duress to support the section 288, subdivision (b) counts prosecuted under that theory. (*Wilkerson, supra,* at pp. 1574, 1576-1577.) The Court of Appeal found there was a sufficient factual basis for duress to support the plea notwithstanding the fact that defendant used both bribes and the threat of violence to get the girls to assent to the molestation. "A person, particularly a child, might act from dual motivations—to receive a reward *and* to avoid harm. As long as the total circumstances support an inference that the victims' participation was impelled, at least partly, by an implied threat, we do not think the factual basis is eliminated by evidence of other motivating factors." (*Id*. at p. 1580.)

*Wilkerson* does not support defendant's position because, as we have already discussed, there is substantial evidence that defendant got A. to assent through the threat of continued punishment until she agreed to perform the sex acts on defendant. *Wilkerson* stands for the proposition that duress exists where the accused uses both a threat and reward to induce the victim's assent. Here, the jury could reasonably infer

7

there was a threat of continuing punishment. Substantial evidence supports the convictions in counts three through five.

*B.    Flight Instruction*

Without objection, the trial court instructed the jury with the standard instruction on flight as evidence of guilt, CALCRIM No. 372.[3] Defendant contends this instruction was error because it lacked evidentiary support and he was prejudiced as a result.

The failure to object to an instruction forfeits the issue on appeal unless "the instruction was an incorrect statement of the law or the defendant's substantial rights were affected." (*People v. Vega* (2015) 236 Cal.App.4th 484, 495.) Moreover, when determining whether a challenged instruction affected a defendant's substantial rights, cases generally equate substantial rights with reversible error, thereby requiring "an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; see *People v. Lawrence* (2009) 177 Cal.App.4th 547, 553, fn. 11.) Since defendant also contends any failure to object constitutes ineffective assistance of counsel we address the claim on the merits.

" 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." ' [Citations.] Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.] To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid

---

[3] The instruction read as follows: "If the defendant fled or tried to flee immediately after the crime was committed, or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

Defendant claims there was insufficient evidence to support the instruction because, while he left the house after learning of A.'s accusations, defendant did not leave town, hide out in an undisclosed location, or leave his house in a particularly hasty manner. The fact that he returned to the home and then left again and subsequently continued to live with A.'s mother is, defendant claims, further evidence that he did not flee.

We are not persuaded. Successfully fleeing is not necessary to support a flight instruction. " ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 522.) Soon after learning that A. had implicated him, defendant displayed other signs of a guilty mind, namely his inculpatory texts to A.'s grandmother in which he expressed remorse. Shortly thereafter, defendant left his keys and wallet at the house, telling A. he was going to say goodbye to his parents and children, and then, before A. was picked up by her grandmother, returned to pick up his keys and wallet before leaving again. This is substantial evidence from which a jury could find flight and from that reasonably infer a guilty mind. Since the instruction was supported by evidence of flight, it was not error to give it.[4]

C.      *Forfeited* Brady *Review*

Before trial, the prosecution obtained A.'s CPS file from the juvenile court pursuant to Welfare and Institutions Code section 827 and reviewed it for exculpatory evidence under *Brady*. The prosecutor informed the trial court and the defense that no such evidence was found. The prosecutor subsequently asked the trial court to review the

---

[4] Even if the instruction could be deemed improper, defendant could not be prejudiced by it in light of the compelling evidence supporting A.'s accusations, namely defendant's inculpatory texts and the evidence that defendant had ejaculated on A.'s bedding.

file. Asked by the trial court for his position on the matter, defense counsel replied, "the problem is that I have not been hired by my client for the purposes of [CPS]." When the trial court asked if counsel had any objection to the court reviewing the CPS file for *Brady* material, counsel responded, "Your Honor, like I say, I am not the attorney on the CPS situation; therefore, I cannot give this consent. He will have to get somebody else." After repeated exchanges where the trial court told counsel it would review the files only for exculpatory evidence, and counsel responded that CPS matters where outside his attorney-client relationship, defense counsel eventually assented to such review.

The trial court subsequently ruled that it would not review the CPS records for *Brady* material because the defense had never petitioned the juvenile court for the CPS file pursuant to Welfare and Institutions Code section 827, a provision which protects the confidentiality of juvenile court records. The defense did not object to the court's ruling and never sought the records from the juvenile court pursuant to Welfare and Institutions Code section 827.

Defendant asks us to conduct our own *Brady* review of the records, which have been lodged with this court.

Welfare and Institutions Code section 827 limits inspection of a case file in a juvenile court proceeding to various persons with an interest in juvenile court proceedings such as the minor, the minor's parents, the district attorney or county counsel, and court personnel. (See Welf. & Inst. Code, § 827, subd. (a)(1) [listing persons entitled to review juvenile court records].) A criminal defendant or defense counsel is not among the persons listed. Access for a criminal defendant to counsel is available only through the statute's general access provision: "Any other person who may be designated by court order of the judge of the juvenile court upon filing a petition." (*Id.*, subd. (a)(1)(Q).) Under this scheme, the "juvenile court has broad and exclusive authority to determine whether, and to what extent, to grant access to

10

confidential juvenile records." (*R.S. v. Superior Court* (2009) 172 Cal.App.4th 1049, 1055.)

Juvenile case files include: "(2) Reports to the court by probation officers, social workers of child welfare services programs, and CASA volunteers; (3) Documents made available to probation officers, social workers of child welfare services programs, and CASA volunteers in preparation of report to the court; [¶] . . . [¶] (5) Transcripts, records, or reports relating to matters prepared or released by the court, probation department, or child welfare services program." (Cal. Rules of Court, rule 5.552(a).)

*Brady* claims are subject to forfeiture for failing to raise the issue in the trial court where the claim is "based on information that was known or available to him at trial." (*People v. Morrison* (2004) 34 Cal.4th 698, 714.) Defendant never sought inspection or release of the CPS records from the juvenile court under the exclusive means for obtaining them, and, while the records were reviewed and lodged with the trial court by the People, defendant did not object to the trial court's decision not to review the files for *Brady* material. He has therefore forfeited the *Brady* claim. Since he does not raise a collateral claim that might require us to review the records, such as ineffective assistance of counsel, we decline to review the records.

D.      *Booking and Classification Fees*

The trial court imposed pursuant to Government Code section 29550.2 a $453.62 main jail booking fee and a $90.65 main jail classification fee. Defendant contends these fees must be stricken pursuant to the changes enacted by Assembly Bill 1869.

Assembly Bill 1869 was signed into law in September 2020 and became operative on July 1, 2021. The bill repeals the authority to collect various fees contingent upon a criminal arrest, prosecution, or conviction for the cost of administering the criminal justice system. (See Stats. 2020, ch. 92, §§ 11, 62.) The bill makes the unpaid balance of these court-imposed costs, including the fees at issue in this case, unenforceable and

11

uncollectible, and requires that any portion of a judgment imposing such costs be vacated. (See Stats. 2020, ch. 92, §§ 11, 62; § 1465.9, subds. (a), (b) [operative July 1, 2021]; Gov. Code, § 6111, subds. (a), (b) [same].) The stated intent of the bill is to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and to eliminate all outstanding debt incurred as a result of the imposition of administrative fees." (Stats. 2020, ch. 92, § 2.)

Since this lessens the consequences of defendant's criminal conviction and there is no savings clause, Assembly Bill 1869 applies retroactively to cases not yet final, such as this one. (*In re Estrada* (1965) 63 Cal.2d 740, 745, 747-748; *People v. Stamps* (2020) 9 Cal.5th 685, 699.) The Attorney General contends Assembly Bill 1869 applies only to the portions of the fees not yet paid, and therefore does not apply to any sums already paid.

The Attorney General's contention ignores the unambiguous language of Government Code section 6111: "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible *and any portion of a judgment imposing those costs shall be vacated*." (Gov. Code, § 6111, subd. (a), italics added.) As the italicized portion makes clear, the part of any judgment imposing such fees is to be vacated. (See *People v. Clark* (2021) 67 Cal.App.5th 248, 260 [Government Code section 6111 "requires, with equally plain language, that the 'portion of [the] judgment imposing those costs shall be vacated' "].)

We shall modify the judgment to vacate the booking and classification fees.

### III. DISPOSITION

The judgment is modified to vacate the Government Code section 29550.2 main jail booking fee of $453.62 and main jail classification fee of $90.65. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of

judgment reflecting the modified judgement, and to forward a certified copy to the Department of Corrections and Rehabilitation.

/S/

RENNER, J.


We concur:

/S/

HULL, Acting P. J.

/S/

MAURO, J.